UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-26 (ECT/LIB)

UNITED STATES OF AMERICA,

                    Plaintiff,              **GOVERNMENT'S
                                            OMNIBUS RESPONSE TO
                                            DEFENDANTS'
          v.                                OBJECTIONS TO THE
                                            REPORT AND
CARL MAURICE BROWN, et al.,                 RECOMMENDATION**

                    Defendants.


The defendants stand charged with conspiracy to distribute fentanyl and methamphetamine based on their respective roles in a large-scale drug trafficking operation in Duluth, Minnesota, overseen and directed by Defendant Ezell "Cash" Lucas. The defendants separately moved to suppress evidence, but those motions were universally rejected by Magistrate Judge Brisbois. After reviewing the parties' extensive written submissions and accompanying exhibits and presiding over a lengthy evidentiary hearing, Magistrate Judge Brisbois recommended that this Court deny the defendants' motions. Several defendants now object to the report and recommendation, but those objections are without merit. Accordingly, the government respectfully asks this Court to adopt the R&R and deny the defendants' motions.

# BACKGROUND

Before the Court are objections to the R&R filed by the following defendants: (1) Ezell Lucas, ECF No. 240; (2) Nasun Witherspoon, ECF No. 236; (3) Deandre Westmoreland, ECF No. 241; (4) Robert Chism, ECF No. 238; and (5) Anthony Green, ECF No. 237. Magistrate Judge Brisbois's R&R details the relevant facts in this case, *see* ECF No. 235 (R&R) 20–37, and the docket captures the procedural history. The facts described below are drawn from those two sources as well as the documentary evidence the government offered in support of its initial response to the defendants' motions as well as the witness testimony from the October 16, 2024, evidentiary hearing. *See* ECF No. 220 (Oct. 16, 2024, Hearing Tr.).

## A.   February 24, 2022: Motel 6, Room #227 and Chevy Blazer (Lucas and Witherspoon)[1]

In late December 2021 and into January 2022, investigators with the Lake Superior Drug and Violent Crime Task Force received information from multiple informants that a man from Chicago named "Cash" was selling heroin and fentanyl in Duluth. According to the informants, "Cash" and an associate who went by "Shorty" used the telephone number XXX-XXX-9441 to arrange

---

[1]   *See* ECF No. 235 (R&R) at 21 –24; Gov't Exh. 1 (Feb. 2022 Motel 6 SW) at 3–9; Gov't Exh. 2 (Feb. 25, 2022, Duluth PD Case Report) at 4–9; Gov't Exh. 3 (Feb. 24, 2022, Sgt. Ryan Taggert Police Report) at 2.

drug deals.  Informants described "Cash" as "a very heavyset black male with short dread-lock styled hair."

On February 17, 2021, the Superior Police Department, working with one of the identified informants, conducted a controlled purchase of fentanyl from "Cash" and "Shorty."  The informant arranged the purchase by contacting "Cash" using the phone number XXX-XXX-9441.  The purchase occurred in Duluth.  "Cash" and "Shorty" arrived in a white Chevrolet Blazer and conducted the sale.

The following day, law enforcement obtained a Pen Register / Trap & Trace with Mobile GPS Location for the phone number associated with "Cash" (i.e., XXX-XXX-9441).  Through the PRTT, investigators learned that Cash's cell phone left Chicago, Illinois on February 23, 2022, and arrived in Duluth on February 24.  Investigators surveilled Duluth and tracked the white Blazer to the Motel 6 at 200 South 27th Ave West.  At the Motel 6, agents saw the driver (a black male, very heavyset with short dread locks) and passenger (black male of average height and weight, with shoulder-length dread locks)—matching the descriptions of "Cash" and "Shorty," respectively.

Investigators spoke with the Motel 6 management, who provided law enforcement with a copy of the "guest list."  An investigator asked about the white Blazer in the parking lot.  The Motel 6 management told him that "the Blazer belonged to Pharoo Witherspoon, who the guest list indicated was

3

registered as a guest from February 20th to February 25th in Room 227."
Investigators reviewed a Chicago Police Arrest Photo of Pharoo N.
Witherspoon; it appeared to be "Shorty."

Following additional surveillance and a second controlled buy, law
enforcement sought a warrant. The affidavit accompanying the warrant,
prepared by Investigator Matthew Nevanen, begins with the following: "The
affidavit is submitted to the court in support of a search warrant authorizing
the search of the premises at the Motel 6, 200 North 27th Avenue West, Room
#227. The motor vehicle of a white Chevrolet Blazer, unknown year, displaying
Wisconsin temporary license plate C5557HE and the person of Pharoo N
Witherspoon Jr." The final paragraph of the affidavit repeats the request at
issue—specifically, authorization to search Motel 6, Room #227, the Chevrolet
Blazer, and Mr. Witherspoon.

St. Louis County District Judge Sally Tarnowski issued the warrant on
February 24, 2024. *Id*. at 11–13. Despite the affidavit's explicit requests to
search Motel 6, Room #227, the warrant itself lists only the following premises,
persons, and motor vehicles to be searched:

> Pharoo Nasun Witherspoon Jr, Date of Birth
> XX/XX/1998
>
> White Chevrolet Blazer, unknown year, displaying
> Wisconsin temporary license plate C5557HE
>
> Pharoo Nasun Witherspoon, Jr., date of birth
> XX/XX/1998

4

The warrant thus erroneously listed Mr. Witherspoon twice and failed to include Motel 6, Room #227.

Not realizing the error and believing the warrant consistent with the affidavit, law enforcement apprehended "Cash" and "Shorty"—that is, Mr. Lucas and Mr. Witherspoon—and searched Mr. Witherspoon, the Chevy Blazer, and Room #227. Investigators recovered from Mr. Witherspoon two baggies of heroin/fentanyl hidden between his butt cheeks. Inside the room, investigators found Mr. Lucas's and Mr. Witherspoon's gym bags, both of which contained powder fentanyl packaged for sale. In total, investigators recovered 66.6 grams of fentanyl.

| Date | Seizure Event | Defendants | Narcotics |
|---|---|---|---|
| Feb. 24, 2022 | Search Warrant | Lucas Witherspoon | 66.6 grams of fentanyl |
| **TOTAL SEIZED TO DATE** | | | **66.6 grams of fentanyl** |

When serving Mr. Witherspoon with the warrant, Investigator Nevanen "noticed the motel room was not listed on the search warrant copy itself." Investigator Nevanen immediately called the investigators conducting the motel room search and "told them that [he] would request an amended search warrant from the court and the search of the motel room should stop." The investigators in the motel room informed Investigator Nevanen that "the search of the motel room had already been completed and they had left the

room." Accordingly, Investigator Nevanen "did not believe it was relevant at that point to submit an amended search warrant," particularly given that "through a review of the affidavit itself, it was obvious that permission was being sought for the motel room, as well."

## B. April 13, 2023: Midtowne Manor Apartment and Jeep Liberty (Erickson)[2]

Between August 2022 and April 2023, law enforcement investigated the suspected narcotics trafficking activities of a Duluth-based member of the Cash DTO: Defendant Matthew Erickson. In April 2023, officers obtained a warrant to search Mr. Erickson, his vehicle, and his apartment.

Mr. Erickson was apprehended when exiting a methadone clinic in Duluth on April 13, 2023. Officers executed the search warrant on Mr. Erickson, his Jeep, and his apartment. They found a small quantity of fentanyl powder and M-30 fentanyl pills in Mr. Erickson's pockets. In the Jeep, investigators found a large quantity of fentanyl—namely, a large, clear plastic baggie containing fentanyl inside the center console and a second large quantity of powder fentanyl (this time in brick form) in a black backpack. In Mr. Erickson's apartment, investigators came upon a "drug packaging station": a small table containing two digital scales, one of which had a white powder-

---

[2]    *See* ECF No. 235 (R&R) at 24–26; Gov't Exh. 4 (Apr. 2023 Erickson, Jeep Liberty, and Midtown Manor SW) at 4–9; *See* Gov't Exh. 5 (Apr. 13, 2023, Duluth PD Case Detail Report) at 6–14.

like residue consistent with heroin and fentanyl; cardboard boxes containing several Essential Everyday-brand sandwich baggies; and multiple pill bottles containing common cutting agents.

| Date | Seizure Event | Defendants | Narcotics |
|---|---|---|---|
| April 13, 2023 | Search Warrant | Erickson | 305 grams of fentanyl |
| **TOTAL SEIZED TO DATE** | | | **371.6 grams of fentanyl** |

## C.    June 7, 2023:  3821 West 5th Street and Vehicles (Chism and Westmoreland)[3]

On February 20, 2023, a confidential informant spoke to investigators about the Cash DTO operating out of Chicago and servicing drug customers in Duluth.  According to the informant, Ezell Lucas (aka "Cash") "stays in Chicago arranging fentanyl sales with customers and directing various runners to conduct the transactions."   The following day, investigators met with the informant and showed the informant an unmarked St. Louis County booking photograph of Mr. Lucas; the informant identified the photo as "Cash."  The informant further stated that the Cash DTO moved large quantities of heroin and fentanyl, and that someone was "always in Duluth delivering the drugs." The informant said that Mr. Lucas's phone number was XXX-XXX-9780, and

---

[3]    *See* ECF No. 235 (R&R) at 26–31; Gov't Exh. 6 (June 2023 3821 W 5th St & Chrysler SW) at 5–10; Gov't Exh. 7 (June 2023 Dodge Dakota SW); Gov't Exh. 8 (Sept. 21, 2023, Duluth PD Case Report Detail) at 5–27; Gov't Exh. 9 (June 2023 Chism & Westmoreland Cellphone SW) at 3–10; Gov't Exh. 10 (June 6, 2023, Chism Phone Analysis) at 3–10.

that customers were commonly directed to the areas of 40th Avenue West and West Seventh Street and 1825 West First Street in Duluth.

On March 28, 2023, the Duluth Police Department tipline received an anonymous call that many people were coming and going for very short amounts of time from the address of 3821 West Fifth Street in Duluth. Investigators researched 3821 West 5th Street and learned that the utilities were paid by a "James L. Dean" with the telephone number XXX-XXX-9470 (a Chicago-area number). The email on the public utilities account was "dubjustus53@gmail." Investigators conducted a Facebook search of "Dub Justus" and discovered two profiles containing the name, both listed as living in Chicago, Illinois. The profile picture on one of the accounts contained a photograph of a person posing for the camera; investigators recognized the individual as Ezell Lucas.

On April 5, 2023, a probation officer drove through the 3800 block of West Fifth Street and saw a man wearing a black balaclava exit 3821 West Fifth Street and get into the driver's seat of a red van (MN No. MVW816). The officer watched the vehicle pick up a female passenger, drive around the block, and then drop off the female passenger in the same general area. Officer Shane McKee with the Duluth Police Department—who later submitted the affidavit of probable cause in support of a search warrant application for the West Fifth

Street residence and the red van—described the drive-around as "a common manner in which drug sales are conducted."

Also, Officer McKee noted that he and other Duluth Police Officers received numerous calls for police service from neighbors surrounding the 3821 West Fifth Street address, expressing concern that the residence was being used to conduct narcotics trafficking. The neighbors reported that multiple people came in and out of the address throughout the day and night—indeed, the neighbors provided pictures of the individuals coming and going. Officer McKee and others with Duluth PD also received multiple 911 calls labeled as "drug incidents," with the callers stating that the red van (MN No. MVW816), located near 3821 West Fifth Street, was being used to deal drugs.

On April 19, 2023, officers stopped the red van for a traffic violation. Officers identified the driver as Isiah Janarius Green; Green pulled the van over on the 3800 block of the west #6 alley, right behind 3821 West 5th Street.

In addition, officers conducted multiple garbage pulls from 3821 West 5th Street. They recovered, among other things, plastic baggies with the corners cut off and white powdery residue inside, used hypodermic needles, and travel documentation—a one-way Greyhound bus ticket from Chicago to Duluth with the name of "Isiah Green" on it, and a United Airlines plane ticket from Chicago to Duluth with the name "Deandre Westmoreland."

In early June, one of the confidential informants told investigators that "the Lucas DTO was still actively selling heroin and or fentanyl in the Duluth area." Further, "[c]oncerned citizens . . . continued to call in complaints about possible drug activity from the red Chrysler van."

Based on that information, on June 7, 2023, Officer McKee applied for and received a search warrant for 3821 West 5th Street and the red Chrysler Town & Country van. That same day, Officer McKee applied for a second warrant to search a Dodge Dakota (MN No. JXW992), which a confidential informant identified as a vehicle used by the Cash DTO and which was parked in the alley next to the red van when officers executed the initial warrant.

Officers executed the warrants on June 7. They approached the red van after it parked in the spot behind the 3821 West Fifth Street residence and apprehended the driver, who was later identified as Defendant Robert Chism. Inside the red van, they found hidden in the window switch panel on the front driver's side drawer two small plastic baggies that contained 33 smaller plastic bags in total that, in turn, held a white substance of suspected narcotics. The white substance field-tested positive for fentanyl.

Parked next to the red van was a second vehicle: the Dodge Dakota. Inside the center console between the driver and front passenger seats, investigators found two packages containing multiple, clear plastic sandwich bags that, in turn, held a white powder-like substance that field-tested positive

for fentanyl.  Behind the driver's seat, investigators found another plastic bag containing a significant amount of fentanyl.

Investigators also searched the residence and apprehended one man inside the home:  Defendant Deandre Westmoreland.  Inside the residence, scattered among the various bedrooms and living spaces, investigators found a significant amount of U.S. currency.

Between the red Chrysler van, the Dodge Dakota, and the residence, investigators found and seized the following:  (1) 391.8 grams of fentanyl, most of which was packaged for sale in ½-gram increments; (2) 262 grams of methamphetamine; and (3) approximately $9,930.00 in U.S. currency.

| Date | Seizure Event | Defendants | Narcotics |
|---|---|---|---|
| June 7, 2023 | Search Warrant | Chism Westmoreland | 391.8 grams of fentanyl<br><br>262 grams of meth |
| **TOTAL SEIZED TO DATE** | | | **763.4 grams of fentanyl**<br><br>**262 grams of meth** |

When Mr. Westmoreland and Mr. Chism were arrested, both men had cellphones in their possession.  Law enforcement applied for a warrant to search those phones.  The attached probable cause affidavit outlined the investigation that preceded the June 7, 2023, search (including all the information contained in the affidavit submitted for that warrant) as well as

the fruits of that search. The affidavit explains that "forensic examination of the mobile phones seized during the arrest of Chism and Westmoreland" may provide "evidence of the above-related crimes including co-conspirators involved in the controlled substance sales, the smuggling of controlled substances into the state of Minnesota, the distribution of U.S. currency as proceeds from the sale of controlled substances" through "data stored on the phone including, but not limited to, call logs, messages, location history, photographs and videos." St. Louis County District Court Judge Leslie E. Beiers issued the warrant on June 23, 2023.

Investigators analyzed Mr. Chism's phone data and uncovered a substantial amount of evidence of drug trafficking related to the Cash DTO. Specifically, the phone data reveals extensive text conversations from January through June 2023 between Mr. Chism and known drug users in the Duluth area, coordinating or otherwise discussing drug sales. There are also text conversations between Mr. Chism and the head of the Cash DTO, Defendant Ezell Lucas, dating back to March 2022, and between Mr. Chism and the Cash DTO's principal Duluth drug connection, Defendant Matthew Erickson, from November 2022 through April 2023—that is, when Mr. Erickson was apprehended by law enforcement for his drug distribution activities connected to the Cash DTO.

12

**D.    June 23, 2023:  3281 West 5th Street and Saturn Ion (Brown and A. Green)[4]**

A week after investigators executed the search warrant on 3821 West 5th Street, a confidential informant told investigators that different members of the same group of dealers were already back up and running, selling fentanyl in Duluth.  The informant stated that the group switched telephone numbers and vehicles—they were now operating out of a 2004 silver Saturn Ion (MN No. MEW665).

The informant personally observed two males conduct a fentanyl sale from the Saturn Ion.  Investigators surveilled 3821 West 5th Street and saw two men—later identified as Defendants Carl Brown and Anthony Green— walk from the back yard of the residence; shortly thereafter, they saw Mr. Brown and Mr. Green in the Saturn Ion conduct what they recognized as a drug sale.  Two days later, investigators saw the two men leave 3821 West 5th Street and enter the Saturn Ion; they obtained video recordings and screen shot photographs of both men.  Investigators showed the photographs of Mr. Brown and Mr. Green to the informant, who "immediately, without hesitation identified the two males as the same ones selling fentanyl."  On numerous additional occasions, investigators watched Mr. Brown and Mr. Green leave

---

[4]    *See* ECF No. 235 (R&R) at 31–33; Gov't Exh. 11 (June 2023 3821 West 5th Street & Saturn Ion SW) at 10–12; *See* Gov't Exh. 12 (Oct. 26, 2023, Duluth PD Case Report Detail) at 1–4.

the residence, enter the Saturn, and drive away for a short period of time before returning to the home.

On June 22, 2023, Officer McKee applied for and received a warrant to search 3821 West 5th Street and the 2004 Saturn Ion. *Id*. Officers executed that warrant on the same day. Officers found and detained Mr. Brown, who was driving the Saturn. They later found and detained Mr. Green, who was inside the residence. Aside from a single digital scale seized from the kitchen of the residence, officers found nothing of evidentiary value inside either the residence or the vehicle.

### E.    July 19, 2023: Isiah Green Traffic Stop[5]

In July 2023, investigators received information from a confidential informant that a member of the Cash DTO was in Duluth, delivering fentanyl in a black 2002 GMC Envoy (MN No. NTN811). By this time, the Cash DTO's modus operandi was becoming plain: in an effort to avoid police detection, the DTO rotated different dealers into Duluth on a regular basis. The driver in the Envoy—Isiah Green—was one of those rotating dealers.

On July 19, 2023, investigators spotted the Envoy driving in Duluth. They followed the Envoy to a gas station in Duluth and saw the driver exit the vehicle and walk to the store. They recognized Isiah Green from prior surveillance as a member of the Cash DTO.

---

[5]    *See* Gov't Exh. 13 (Sept. 21, 2023, Duluth PD Case Report Detail) at 4–6.

Officers conducted a traffic stop and then, after learning that Isiah Green had outstanding arrest warrants, took him into custody. Mr. Green consented to search of his car and acknowledged that he had illicit narcotics tucked in his underwear. Before transporting Isiah Green to jail, investigators escorted him to the bathroom and recovered the narcotics.

In total, investigators seized $1,600.00 in U.S. currency from Green's pocket and an additional $27.00 from the center console and driver's seat floorboard of the Envoy. They also seized five individually packaged bags of a white powdering substance from Green's underwear. The substance, which weighed 3.5 grams, field-tested positive for fentanyl.

| Date | Seizure Event | Defendants | Narcotics |
|---|---|---|---|
| July 19, 2023 | Traffic Stop | N/A | 3.5 grams of fentanyl |
| **TOTAL SEIZED TO DATE** | | | **766.9 grams of fentanyl**<br><br>**262 grams of meth** |

## F.    August 3 – October 12, 2023:  Undercover Operation and Related Seizures

In early August 2023, investigators launched an undercover investigation that resulted in 12 controlled buys from members of the Cash DTO. During this period, investigators also completed three different seizure events. Those events are discussed below.

### 1.    Undercover Operation (Brown, A. Green, Lucas)[6]

Based on information supplied by confidential informants, law enforcement understood the mechanics of the Cash DTO's distribution network.  Mr. Lucas ran the operation from Chicago.  Mr. Lucas (or an unidentified woman operating the DTO phone) fielded calls from Duluth-based users seeking fentanyl.  Mr. Lucas directed those users to meet with one of the Cash DTO runners at a predetermined location in Duluth.  The runners, who had fentanyl on hand, met with the users at the locations Mr. Lucas provided and exchanged fentanyl for cash.

Law enforcement obtained the Cash DTO's phone number from a confidential informant, and then an investigator, operating undercover, arranged to purchase fentanyl from Mr. Lucas.  Between August 2 and October 18, the undercover agent completed 12 controlled buys.  For seven buys, Mr. Lucas manned the Cash DTO phone and directed the sale from Chicago.  For five buys, the unidentified woman coordinated the transactions.  The buys principally involved three delivery distributors:  (1) Carl Brown, (2) Anthony Green, and (3) Isiah Green.  For one buy, however, Mr. Lucas himself served as the distributor, providing the undercover agent fentanyl in exchange for cash.

---

[6]    *See* ECF No. 235 (R&R) at 33–34; Gov't Exh. 14 (UC Reports).

| Date | Seizure Event | Defendants | Narcotics |
|---|---|---|---|
| Aug. 3, 2023 | UC Buy | Lucas Brown | 0.9 grams of fentanyl |
| Aug. 8, 2023 | UC Buy | Lucas Brown | 1.1 grams of fentanyl |
| Aug. 14, 2023 | UC Buy | Lucas Brown | 0.97 grams of fentanyl |
| Aug. 29, 2023 | UC Buy | Anthony Green Lucas | 0.95 grams of fentanyl |
| Sept. 7, 2023 | UC Buy | Lucas | 0.57 grams of fentanyl |
| Sept. 13, 2023 | UC Buy | Lucas | 1.04 grams of fentanyl |
| Sept. 18, 2023 | UC Buy | N/A (Isiah Green) | 2.2 grams of fentanyl |
| Sept. 20, 2023 | UC Buy | Lucas | 2.3 grams of fentanyl |
| Sept. 26, 2023 | UC Buy | N/A (Isiah Green) | 1.16 grams of fentanyl |
| Oct. 2, 2023 | UC Buy | Anthony Green | 1.94 grams of fentanyl |
| Oct. 5, 2023 | UC Buy | Anthony Green | 1.12 grams of fentanyl |
| Oct. 18, 2023 | UC Buy | Lucas Anthony Green | 0.95 grams of fentanyl |
| **TOTAL SEIZED TO DATE** | | | **782.1 grams of fentanyl**<br><br>**262 grams of meth** |

### 2.    August 16, 2023:  Carl Brown Arrest[7]

Following the undercover agent's controlled buys from Defendant Carl

Brown, law enforcement decided to take Mr. Brown into custody on "probable

cause charges for selling fentanyl."  Through physical and electronic

surveillance, investigators tracked Mr. Brown as he left his temporary

residence (the Willard Munger Inn, located in Duluth) and conducted two

apparent hand-to-hand drug sales from his Ford Expedition (the PRTT on Mr.

---

[7]    *See* ECF No. 235 (R&R) at 34–35; Gov't Exh. 15 (Aug. 16, 2023, Police Report) at 3–4; Gov't Exh. 16 (Aug. 2023 Willard Munger Inn Unit 103 SW) at 4–5.

Lucas's phone showed several incoming and outgoing calls with known customers of the Cash DTO). Investigators arrested Brown after he pulled into a gas station. They searched Mr. Brown's Expedition and found a knotted baggie with white powder that later field-tested positive for fentanyl and weighed .57 grams (driver's floorboard), a cell phone with a number matching that previously identified by investigators on the Lucas PRTT (center console), and $180.00 in U.S. currency (center console).

Investigators then applied for and obtained a search warrant for Brown's room at the Willard Munger Inn. Inside the room, investigators found a duffel bag on the nightstand next to the bed; they seized from the duffel bag's side pocket two bundles of U.S. currency ($640.00 and $850.00, respectively) and a sandwich baggie containing 15 individually packaged bags of suspected fentanyl. The contents of the sandwich baggie field-tested positive for fentanyl and weighed 8.91 grams. Further, investigators found a backpack on the desk, inside of which they located three bundles of U.S. currency, each secured with rubber bands, that totaled $4,023.00.

| Date | Seizure Event | Defendants | Narcotics |
|------|---------------|------------|-----------|
| Aug. 16, 2023 | Search Warrant | Brown | 9.47 grams of fentanyl |
| **TOTAL SEIZED TO DATE** | | | **791.57 grams of fentanyl** <br><br> **262 grams of meth** |

### 3.    October 12, 2023:  Isiah Green Death Investigation and Narcotics Seizure[8]

On October 12, investigators seized a significant amount of fentanyl and methamphetamine from the temporary apartment of Cash DTO distributor Isiah Green.  Officers with the Duluth PD responded to a 911 call indicating that a man at Miketins Boarding—located at 30 E 2nd Street in Duluth—was passed out in the shower.  The man—Isiah Green—was unresponsive and not breathing.  An officer arrived at the scene and found Green on the ground, laying on his back.  He was dead.

Officers searched the apartment, starting with the shower room, in which they found clothes and a bag.  Inside the bag, officers found two crumpled-up bills (a $5 bill and a $1 bill) that had a white substance inside them.  There was also a baggie with "a bunch of small baggies" containing the same white powdery substance, next to the crumpled-up bills.  The white powdery substance field-tested positive for fentanyl; the baggies collectively weighed 23.28 grams.

Officers then searched the remainder of the apartment.  Isiah Green's roommate explained which portion of the room contained his effects, and which contained those belonging to Green.  In Green's section of the room, officers

---

[8]    ECF No. 235 (R&R) at 33 n.18; Gov't Exh. 17 (Dec. 4, 2023, Duluth PD Case Report Detail) at 2–3; Gov't Exh. 18 (Nov. 11, 2023, Midwest Medical Examiner's Office Report—Isiah Green).

found a safe and keys to access it.  The roommate confirmed that the safe was not his.  Inside the safe, officers found a large amount of currency ($2,710.00), a grocery bag containing a crystal-like substance, and a collection of smaller baggies containing a white powdery substance like those found in the shower room.  The crystal-like substance field-tested positive for methamphetamine and weighed 574.29 grams.  The white powdery substance field-tested positive for fentanyl and weighed 62.92 grams.

A medical examiner performed an autopsy on Isiah Green's body.   The medical examiner categorized the death as an accident and listed the cause of death as "acute fentanyl toxicity."

| Date | Seizure Event | Defendants | Narcotics |
|------|---------------|------------|-----------|
| Oct. 12, 2023 | Death Investigation | N/A | 88.86 grams of fentanyl<br><br>574.29 grams of meth |
| **TOTAL SEIZED TO DATE** | | | **880.43 grams of fentanyl**<br><br>**836.29 grams of meth** |

### 4.    October 20, 2023:  Hidden Fentanyl Seizure (A. Green)[9]

On October 20, investigators found around 50 grams of fentanyl hidden in an unmarked wooden area.  The Duluth Police Department received a tip from a "concerned citizen" regarding suspicious activity near the woods located

---

[9]    *See* ECF No. 235 (R&R) at 35; Gov't Exh. 19 (Oct. 20, 2023, Police Report) at 2–4.

by 14th Avenue East and East 8th Street in Duluth. The tip included photographs of a male driving a maroon Oldsmobile (MN No. KWM986). Investigators recognized the male as Anthony Green and the Oldsmobile as the vehicle used by the Cash DTO to conduct fentanyl sales. An additional tip submitted on October 19, 2023, described Mr. Green parking the Oldsmobile near the woods and then entering the woods for a brief period.

Responding to the tips, a narcotics investigator took her narcotics detection K9 Maverick into the wooded area on foot. The investigator saw several empty clear plastic sandwich bags near the trail, and then came upon a grey plastic grocery bag that, although twisted shut, evidently had something inside it. She seized the item and found inside it three separate clear plastic sandwich bags, each of which contained 30 bindles that, in turn, held approximately .5 grams of a white, powder-like substance. She conducted a field test on the contents of one of the bindles, which yielded a positive result for the presence of fentanyl. In total, the bindles weighed 50.3 grams.

| Date | Seizure Event | Defendants | Narcotics |
|------|---------------|------------|-----------|
| Oct. 20, 2023 | Abandoned Woods Property Seizure | Anthony Green | 50.3 grams of fentanyl |
| **TOTAL SEIZED TO DATE** | | | **930.73 grams of fentanyl**<br><br>**836.29 grams of meth** |

### G.    October 25, 2023:  Final Arrests and Fentanyl Seizure[10]

On October 25, investigators monitoring the Cash DTO drug phone noted that the phone was outside the Chicago area and traveling toward Duluth. Gov't Exh. 20 (Oct. 30, 2023, Duluth PD Case Report Detail) at 4.  Although the phone was mostly off, it was sporadically turned on over a several-hour period.  When it was on, the phone had contact with XXX-XXX-9919, a phone number investigators identified as being used by Anthony Green. Investigators knew that Mr. Green was in the Twin Ports area then, and geolocation tracking confirmed that the Cash DTO drug phone ultimately arrived in Duluth.

Investigators believed that Mr. Lucas was likely the individual transporting the Cash DTO drug phone to Duluth, as he had two separate reasons for making the trip.  First, Mr. Lucas was scheduled to have a court hearing on October 26, 2023, in connection with the February 2022 drug sale case (i.e., the first seizure event).  Second, following the fentanyl seizure from the woods, investigators believed the Cash DTO had no additional fentanyl supply in Duluth.  On October 24, the anonymous tipper again called the Duluth PD and stated that he saw Mr. Green return to the wooded area twice

---

[10]    *See* ECF No. 235 (R&R) at 35–37; Gov't Exh. 20 (Oct. 30, 2023, Duluth PD Case Report Detail) at 4–12; Gov't Exh. 21 (Oct. 25, 2023, Police Report) at 4; Gov't Exh. 22 (A. Green Interview); Gov't Exh. 23 (Oct. 2023 Cash DTO Phone SW); Gov't Exh. 24 (Feb. 6, 2024, Cash DTO Phone Analysis).

"as if he was looking for something."  And then the PRTT on the Cash DTO drug phone showed a notable decline in outgoing calls; although the PRTT captured several incoming calls from suspected drug customers, those calls where not answered or returned.

Once the Cash DTO drug phone began pinging in Duluth, investigators set up physical surveillance around Mr. Green's known address and identified Mr. Lucas—he was driving a silver Nissan Rogue (IL No. DP24872) with an unidentified woman.  Mr. Green was sitting in the driver's seat of the maroon Oldsmobile Ciera that he had been using to conduct drug sales, and Mr. Lucas pulled up alongside him.  Mr. Lucas exited the Nissan and got into the passenger seat of the Oldsmobile; he stayed for five to ten minutes.  He then got out of the Oldsmobile and returned to the Nissan and drove to a Mexican restaurant in Duluth.

Investigators followed Mr. Lucas to the restaurant and then, after Mr. Lucas and the woman had lunch, apprehended the duo as they exited the restaurant and returned to the SUV.  Mr. Lucas and the woman were taken to Duluth Police Headquarters for questioning.   On Mr. Lucas's person, investigators found a phone, which rang when investigators called the Cash DTO drug phone.

Investigators then located Mr. Green at a gas station and took him into custody.  While being placed under arrest, Mr. Green attempted to discard a

sandwich baggie containing numerous small, knotted baggies of suspected fentanyl. The baggie was seized, and the contents analyzed, weighed, and tested. Inside the larger sandwich baggie, investigators found 30 individually knotted baggies of suspected fentanyl, seemingly packaged for sale. The baggies weighed 17 grams, and a sample of the contents field-tested positive for fentanyl.

Mr. Green, Mr. Lucas, and the woman with Mr. Lucas were separately given *Miranda* warnings. Mr. Green agreed to give a post-*Miranda* statement. He gave nothing of evidentiary value.

| Date | Seizure Event | Defendants | Narcotics |
|---|---|---|---|
| Oct. 25, 2023 | Arrests / Search Warrant | Lucas<br>Anthony Green | 17 grams of fentanyl |
| **TOTAL SEIZED TO DATE** | | | **947.73 grams of fentanyl**<br><br>**836.29 grams of meth** |

Following the arrests, law enforcement obtained a warrant to search both Mr. Lucas's and Mr. Green's cellphones. Although Mr. Green's phone is still being processed, investigators were able to complete an initial assessment of Mr. Lucas's phone. The phone contained an "extensive amount of evidence" relating to Mr. Lucas's "drug sales" and "role leading" the Cash DTO. In particular, law enforcement uncovered messages of "drug orders from customers and advertisements about new products to customers" as well as

"many text messages involving [Mr. Lucas] directing his runners and other communication about the business."

Relevant here, the data from Mr. Lucas's phone also offers insight into the extent of Mr. Green's involvement in, and knowledge of, the Cash DTO's distribution activities. The phone data contains text messages between Mr. Lucas and Mr. Green that begins on June 3, 2023—that is, before law enforcement first searched the West 5th Street stash house and seized 391.8 grams of fentanyl and 262 grams of meth—and ends on October 1, 2023. The phone data also includes a Facebook Messenger conversation between Mr. Lucas and Mr. Green that begins on January 10, 2023, and goes through October 25, 2023—the day Mr. Lucas and Mr. Green were apprehended.

As law enforcement noted in the phone analysis report, the text messages between Mr. Lucas and Mr. Green "clearly demonstrate [Mr. Lucas's] role within the DTO, consistently directing [Mr. Green] to meet customers." Below is an illustrative text conversation from July 3, 2024:

| | |
|---|---|
| **Lucas**: | 333 N 1st w |
| | Start calling this phone |
| | They want 1 |
| **Green**: | where they it's only one person here |
| | i'm on 43n 5 |
| **Lucas**: | 17th Ave east and London rd |
| **Green**: | finna hit the room n shit send u the count |

**Lucas**:     It p on 3 masaba

**Lucas**:     1-1890$ i didn't get to finish that jab it was still 6 left.

According to law enforcement, this exchange captures Mr. Lucas directing Mr. Green to a predetermined location to meet a drug customer—"They want 1" referring to either "one gram or one half-gram," as the Cash DTO "typically has packaged their controlled substances in half-gram bindles." At the end of the conversation, Mr. Green "is saying he will count the money and/or drugs and report the inventory back to [Mr. Lucas]," and then reporting that during his shift as a distributor, the Cash DTO made $1,000 to $1,890 in "drug proceeds." The term "jab" is slang that refers to "a bag containing several small bags or bindles of controlled substances," which is the way the Cash DTO "consistently packaged their drugs."

The text thread between Mr. Lucas and Mr. Green contains many such exchanges. There are also several incriminating photographs, including the below picture that Mr. Green sent to Mr. Lucas on July 11, 2023:



## **LEGAL STANDARD**

When a defendant challenges the probable cause offered to support a warrant, courts analyze whether the warrant application demonstrates "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Oftentimes, the probable cause determination rests on "information supplied by an informant." *United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008). In such circumstances, "the core question in assessing probable cause is whether the information is reliable." *Id.* at 839–40 (internal quotation marks and ellipses omitted).

Importantly, a magistrate "reviewing an application for a search warrant employs a totality-of-the-circumstances analysis and makes a practical decision based on such factors as the veracity of the affidavit and the basis of

knowledge of any person supplying hearsay information." *Id.* at 839.  This Court, in its capacity as a "reviewing court," must "allow substantial deference to a magistrate's determination of probable cause." *Id.*

Moreover, even if a court determines that a search warrant was issued without the requisite probable cause showing, the evidence seized pursuant to that warrant is nevertheless admissible if "the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008).  Evidence is suppressed only if "(1) the affiant misled the issuing judge with a knowing or reckless false statement; (2) the issuing judge wholly abandoned her judicial role; (3) the supporting affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or (4) the warrant was 'so facially deficient' that the executing officer could not reasonably presume its validity." *United States v. Notman*, 831 F.3d 1084, 1089 (8th Cir. 2016) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)) (cleaned up).

## ANALYSIS

Before the Court now are the objections to the R&R filed by Mr. Lucas, Mr. Witherspoon, Mr. Westmoreland, Mr. Chism and Mr. Green.  As discussed below, those objections are without merit.  Accordingly, the government respectfully asks this Court to adopt the R&R.

A.    **Mr. Witherspoon's and Mr. Lucas's Objections (ECF Nos. 236, 240)**

1.    **Binding Eighth Circuit precedent establishes that Mr. Witherspoon had no legitimate expectation of privacy as to the guest registry information disclosed to motel staff.**

In his initial motion to suppress, Mr. Witherspoon argued that officers violated his Fourth Amendment rights by "contacting the Motel 6 front-desk clerk to learn [his and Mr. Lucas's] names and room numbers." Doc. 136 (Witherspoon Mot. to Suppress) at 1. According to Mr. Witherspoon, "[t]hat information was gathered and disseminated by the Motel to be in compliance with Duluth City Ordinance 29-9 and also Minn. Stat. § 327.10," which, pursuant to the Supreme Court's ruling in *City of Los Angeles California v. Patel*, 576 U.S. 409 (2015)), rendered the search unconstitutional. *Id*. But as Magistrate Judge Brisbois noted in the R&R, that argument has been explicitly rejected by the Eighth Circuit. *See* ECF No. 235 (R&R) at 39–41.

In *United States v. Sesay*, the Eighth Circuit considered a defendant's argument that, under *Patel*, a "search of the motel's guest registry violated his Fourth Amendment Rights, and that the evidence seized from his hotel room and during the traffic stop must be suppressed as fruit of an unlawful search." 937 F.3d 1146, 1151 (8th Cir. 2019). The Eighth Circuit held that the defendant's "contention fails under the so-called third-party doctrine: 'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.'" *Id*. at 1152 (quoting *Smith v. Maryland*, 442 U.S. 735,

743–44 (1979)). Specifically, the Eighth Circuit concluded that the defendant "had no legitimate expectation of privacy in the identification card that he provided when registering at the motel." *Id.* In reaching that decision, the Eighth Circuit further emphasized that "*Patel*'s ruling in favor of hotel owners does not support [the defendant's] contention," explaining that the Supreme Court in *Patel* "did not hold that *motel guests* have a privacy interest in registration records; to the contrary, the decision acknowledged that 'hotel operators remain free to consent to searches of their registries.'" *Id.* (citing *Patel*, 576 U.S. at 423).

Applying *Sesay*, Magistrate Judge Brisbois concluded that Mr. Witherspoon and Mr. Lucas "had no legitimate expectation of privacy interest in the guest registry Defendant Witherspoon disclosed to the Motel 6 staff." ECF No. 235 (R&R) at 41.

Mr. Witherspoon objects to that ruling. Specifically, Mr. Witherspoon restates his argument that *Sesay* is not controlling on the Court—albeit with a twist. In his pretrial briefing, Mr. Witherspoon focused principally on state and local ordinances purportedly requiring motel staff to provide its guest registry to law enforcement upon request, *see* ECF No. 225 (Lucas & Witherspoon Post-Hearing Br.) at 9; now, Mr. Witherspoon asserts that Mr. Witherspoon was "required" per city ordinance and statute law to provide his "name, address, drivers license, make, and model and license plate of [his] car"

30

as well as his "credit or bank debit card information," thereby obviating the "voluntariness" of his disclosure, ECF No. 236 (Witherspoon Obj. to R&R) at 5. Magistrate Judge Brisbois appropriately dismissed the former, explaining that "there is no evidence in this case suggesting that Motel 6 staff provided the Guest List to law enforcement only due to an obligation to do so under state and local ordinances," and even if there was, "such considerations have no bearing on the 'voluntariness' consideration of the Defendant's disclosure of information on the Guest List." ECF No. 235 (R&R) at 40–41.

The latter is likewise unavailing. For one, the factual and legal circumstances here accord with those in *Sesay*—there is no indication that the state statutes and municipal ordinances the defendants cite were either adopted or amended following the Eighth Circuit's ruling in *Sesay*; the relevant laws are the same. Moreover, the defendants misconstrue the "voluntariness" consideration. The third-party doctrine obviates a defendant's privacy interest when a defendant voluntarily engages a third party and, in the process, discloses personal information to that third party. *See United States v. Miller*, 425 U.S. 435, 443 (1976) (holding that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and confidence placed in the third party will not be betrayed"). Accordingly, the doctrine shields from

suppression, among other things, checks and deposit slips retained by a bank, electricity-usage statistics tracked by a utility company, and income tax returns provided to an accountant. *See United States v. McIntyre*, 646 F.3d 1107, 1111 (8th Cir. 2011) (collecting cases). In those circumstances, the legal requirements related to the disclosure of personal information when one voluntarily elects to engage a third party for any of those services had no bearing on the applicability of the third-party doctrine. Those requirements likewise should have no bearing here. Indeed, as Magistrate Judge Brisbois noted, "the fact that state and local laws required motel operators to provide guest registry information to law enforcement upon request should have alerted Defendants that they had no privacy interest in the information they voluntarily provided to the Motel 6." ECF No. 235 (R&R) at 41.

The Eighth Circuit addressed the issue directly in *Sesay*: motel guests have no legitimate expectation of privacy in the guest registry information disclosed to the motel staff. Accordingly, Mr. Witherspoon's motion is without merit, and the R&R should be adopted.

### 2. The Eighth Circuit's guidance on the exclusionary rule affirms that the evidence seized pursuant to the Motel 6 warrant should not be suppressed.

For his part, Mr. Lucas focuses on the facial defects in the warrant to search Motel 6, Room #227 and the collateral effect such defects have on

subsequent warrants issued and executed in this case.  But those arguments were considered and appropriately rejected by Magistrate Judge Brisbois.

> ### a. Despite the February 2022 Motel 6 search warrant's facial defects, the exclusionary rule should not be applied because the officers were, at most, negligent—their conduct did not reflect the type of deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights that the exclusionary rule is designed to deter.

Mr. Lucas argues that Magistrate Judge Brisbois erred in relying on *United States v. Szczerba*, 897 F.3d 929 (8th Cir. 2018), in declining to suppress evidence seized from Room #227.  Mr. Lucas is mistaken.

After reviewing the warrant and accompanying affidavit and hearing testimony from Deputy Nevanen, Magistrate Judge Brisbois concluded that the exclusionary rule did not warrant suppression in this case.  *See* ECF No. 235 (R&R) at 42–44.  Magistrate Judge Brisbois explained that although the warrant "lacked particularity because it did not list Room #227 as one of the rooms to be searched," the warrant affidavit and Deputy Nevanen's testimony established that "Deputy Nevanen acted in a manner that was mindful of the Fourth Amendment warrant requirements, and the error was 'simply a mistake.'" *Id*. at 44 (citing Tr. at 30).

Magistrate Judge Brisbois's ruling accords with prevailing Eighth Circuit authority.  The Eighth Circuit instructs that "[n]ot every Fourth Amendment violation results in exclusion of the evidence obtained pursuant to

a defective search warrant." *United States v. Szczerba*, 897 F.3d 929, 937 (8th Cir. 2018). Because the purpose of the exclusionary rule is to "safeguard Fourth Amendment rights generally through its deterrent effect," it applies "only where it results in appreciable deterrence." *Id.* (citing *Herring v. United States*, 555 U.S. 135, 139–41 (2009)) (cleaned up). And "[o]ver time," the "cost-benefit analysis in exclusion cases" has been "recalibrated" to "focus on the flagrancy of the police misconduct at issue." *Id.* at 938 (citing *Davis v. United States*, 564 U.S. 229, 238 (2011)) (cleaned up). Accordingly, suppression is warranted only when "law enforcement officers exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights"; when police mistakes "are the result of negligence rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" *Id.* (citing *Davis*, 564 U.S. at 238; *Herring*, 555 U.S. at 147–48) (cleaned up).

Because the record establishes that Deputy Nevanen was "mindful of the Fourth Amendment warrant requirements," and his error in drafting the affidavit was "simply a mistake," Magistrate Judge Brisbois correctly concluded that the evidence seized from Room #227 should not be suppressed. ECF No. 235 (R&R) at 44. *See also State v. Lucas*, St. Louis County Dist. Ct., File No. 69DU-CR-22-580, Omnibus Order, at 12 n.5 (Aug. 1, 2023) (specifically

"commend[ing]" Deputy Nevanen for "doing exactly what he should have done upon discovery the error in the warrant").

Mr. Lucas again attempts to distinguish *Szczerba*, but his efforts are unavailing.

First, Mr. Lucas asserts that the warrant in *Szczerba* was "found to be *valid* and not facially defective," whereas the warrant here is facially defective. ECF No. 240 (Lucas Obj. to R&R) at 7. Accordingly, Mr. Lucas argues that the warrant here is more akin to that in *Groh v. Ramirez*, which the Supreme Court deemed constitutionally deficient. 540 U.S. 551, 557–63 (2004). Not so.

In *Szczerba*, the warrant authorized only the search of "said person"—it did not, on its face, authorize the search of the hotel room or vehicle. 897 F.3d at 937. Despite the facial error, the Eighth Circuit declined to suppress the evidence seized from the hotel room and vehicle, explaining that the mistake was simply a "clerical error," citing the "warrant's meticulous identification of the hotel room and the Mercedes, and the affidavit's similarly meticulous description and its request to search the hotel room and Mercedes" as well as the warrant's "otherwise nonsensical authorization of the seizure of 'above described property (i.e., the hotel room and Mercedes) if it 'be found on the said person by you.'" *Id*. Conversely, in *Groh*, the Supreme Court concluded that the warrant's failure to describe the items to be seized could not be "characterized as a mere technical mistake or typographical error," explaining

35

that the issuing judge could "conceivably" have concluded that the limited authorization detailed in the warrant itself, as opposed to the more expansive search request in the warrant affidavit, was more appropriate. 540 U.S. at 557, 560–61.

Here, the warrant and accompanying affidavit make plain that the mistake was simply the type of "clerical error" or "typographical error" that does not warrant suppression. As in *Szczerba*, the affidavit here contains a "meticulous description" of, and explicit "request to search," the motel room along with Mr. Witherspoon and his vehicle. 897 F.3d at 937. Against that backdrop, it is impossible to read the authorizing language in the warrant (i.e., twice listing Mr. Witherspoon, while omitting reference to the motel room) as a "conceivabl[e]" deviation from the affidavit by the issuing judge. *Groh*, 540 U.S. at 560–61. It would be "nonsensical" for the issuing judge to have authorized law enforcement to search Mr. Witherspoon twice and decline authorization to search the motel room. *Szczerba*, 897 F.3d at 937. The duplicative language, when coupled with the specificity of the affidavit, verifies that the mistake was merely "clerical" or "typographical," thereby affirming the applicability of *Szczerba* and rendering *Groh* inapposite.

Second, Mr. Lucas reiterates his position that "the officer who obtained the warrant in *Szczerba* brought a copy of the warrant and her supporting affidavit along when she went to the room to conduct the search." ECF No.

240 (Lucas Obj. to R&R) at 7. But Mr. Lucas raised that same argument before the R&R issued, and Magistrate Judge Brisbois correctly found it unavailing. Again, the guidance from *Szczerba* is to assess the "totality of the circumstances" and determine whether Deputy Nevanen was "most mindful of the Fourth Amendment warrant requirement." 897 F.3d at 939. Deputy Nevanen applied for a warrant, clearly specified in the warrant affidavit the locations he was seeking authorization to search, and, upon learning of the warrant's facial defect, called the officers conducting the search and instructed them to stop. Magistrate Judge Brisbois credited Deputy Nevanen's testimony that "the omission of Room #227 from the proposed search warrant . . . was 'simply a mistake,'" and emphasized that the affidavit "does not conceal any facts from the Judge that were pertinent to the requisite probably cause necessary for the Judge to issue the warrant." ECF No. 235 (R&R) at 43–44. Accordingly, Magistrate Judge Brisbois found that "[c]onsidering the totality of the circumstances, applying the exclusionary rule in this case would not result in appreciable deterrence of police misconduct." *Id*. at 44.

That finding is consistent with the facts and the law. It should be adopted.

**b.   The Court's ruling on the admissibility of evidence recovered from Mr. Lucas and Mr. Witherspoon's motel room in February 2022 has no bearing on the remaining warrants issued in this case.**

Separately, Mr. Lucas asserts that the evidence obtained from subsequent warrants to track and search Mr. Lucas's cellphone should be suppressed because of purported "material omissions" that "taint" the phone warrants. ECF No. 240 (Lucas Obj. to R&R) at 8. But as Magistrate Judge Brisbois found, even if the evidence seized from the Motel 6 in February 2022 was ordered suppressed, the evidence seized pursuant to the August and October 2023 warrants concerning Mr. Lucas's drug trafficking phone would nevertheless be admissible under the independent source doctrine. *See* ECF No. 235 (R&R) at 44–46.

The independent source doctrine "allows admission of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *United States v. Green*, 9 F.4th 682, 693 (8th Cir. 2021). To invoke admission, the government must show that (1) the police would have "applied for the warrant had they not acquired the tainted information"; and (2) the application affidavits "support probable cause after the tainted information has been redacted." *United States v. Swope*, 542 F.3d 609, 613–14 (8th Cir. 2008). The Eighth Circuit counsels against a "strictly literal interpretation" of either prong. *Id.* at 614.

As Magistrate Judge Brisbois concluded, the cell phone search warrants—issued a year-and-a-half after the February 2022 search and following months of extensive, independent investigation—are supported by independent probable cause, wholly distinct from the evidence seized in February 2022. *See* ECF No. 235 (R&R) at 44–46. The probable cause affidavit attached to the warrant to search Mr. Lucas's cellphone is 22 pages long. Gov't Exh. 23 (Oct. 2023 Cash DTO Phone SW) at 1–22. It includes a single paragraph on the February 2022 search of Mr. Lucas and Mr. Witherspoon's motel room. *Id*. at 3. The very next paragraph jumps to events from February 2023—one year later—noting how a confidential reliable informant told law enforcement "about a group of fentanyl dealers who were operating in Duluth," led by a leader "identified as Ezell Lucas, aka 'Cash.'" *Id*. What follows is a detailed, 19-page explication of law enforcement's subsequent investigation into the Cash DTO—the additional tips from informants; the additional warrants obtained, searches conducted, and fentanyl seized; the extensive undercover operation; and the arrest of Mr. Lucas on October 25, 2023. *Id*. at 3–21.

The one-year gap between the February 2022 search and the February 2023 informant tip demonstrates that investigators did not take any immediate investigative action following the disputed Motel 6 search. The extensive investigation that followed the February 2023 informant tip

establishes that "police would have sought the [cellphone] warrant even if the initial entry [in February 2022] had not occurred." *Green*, 9 F.4th at 693. And given the affidavit's lengthy discussion of those subsequent investigative efforts, the paragraph on the February 2022 search "did not affect the magistrate's decision to issue warrant"—excising that paragraph from the warrant affidavit would have no bearing on the probable cause determination. *Id.* (emphasis omitted).

## B.   Mr. Westmoreland's and Mr. Chism's Objections (ECF Nos. 241, 238)

Defendants Deandre Westmoreland and Robert Chism sought to suppress evidence obtained during and following the June 7, 2023, search of the Cash DTO stash pad at West 5th Street. Mr. Westmoreland challenged the warrant to search the West 5th Street home and Chrysler minivan, and Mr. Chism contested the warrant to search his cell phone that law enforcement seized when searching the home and van. *See* Doc. 154 (Westmoreland Mot. to Suppress); Doc. 180 (Chism Mot. to Suppress). Magistrate Judge Docherty recommends that this Court deny both motions. *See* ECF No. 235 (R&R) at 54–63. Both defendants object. *See* ECF No. 241 (Westmoreland Obj. to R&R); ECF No. 238 (Chism Obj. to R&R). The government addresses each objection in turn.

**1.    Magistrate Judge Brisbois correctly concluded that the warrant to search the West 5th Street home and Chrysler minivan was supported by ample probable cause.**

In his motion to suppress, Mr. Westmoreland argued that the warrant affidavit fails to establish a "temporal nexus" between "the evidence gathered and why a search of the residence on June 7, 2023, would yield evidence of a crime." ECF No. 154 (Westmoreland Mot. to Suppress) at 1. Further, Mr. Westmoreland asserted that certain factual averments in the affidavit were "vague and lacked specificity." ECF No. 219 at (Westmorland Post-Hearing Br.) at 6. Neither argument has merit. Upon reviewing the relevant search warrant affidavit, Magistrate Judge Brisbois concluded that the averments in the affidavit were sufficiently proximate and specific to establish probable cause for the search. *See* ECF No. 235 (R&R) at 54–58.

First, the Eighth Circuit has held that arguments of "staleness" in the context of ongoing drug conspiracies are without merit, explaining that for investigations into "ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant [do] not necessarily make the information stale." *United States v. Ortiz-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017). Indeed, narcotics conspiracies are "the very paradigm of the continuing enterprises for which the courts have relaxed temporal requirements of non-staleness." *United States v. Ortiz*, 143 F.3d 728, 733 (2d Cir. 1998).

41

Here, the probable cause affidavit details the extensive investigation into the drug trafficking conspiracy at issue—that is, the "Cash DTO." The factual averments include the following:

- February 2023: A confidential reliable informant told law enforcement that the Chicago-based Cash DTO was "arranging fentanyl sales with customers and directing various runners to conduct the transaction" and said that "this DTO had large quantities of heroin and/or fentanyl, and that someone was always in Duluth delivering the drugs." Gov't Exh. 6 (June 2023 3821 W 5th St & Chrysler SW) at 4–5.

- March 2023: Law enforcement received a tip from a concerned citizen noting the suspicious activity at 3821 West Fifth Street in Duluth. *Id*. at 5. Law enforcement analyzed the rental information for the property and identified a connection between the renter's email address and the public Facebook profile for Defendant Ezell Lucas, the head of the Cash DTO. *Id*. at 6. Law enforcement conducted several trash pulls from the residence, which revealed evidence of drug trafficking—specifically, "multiple clear plastic baggies with the corners ripped out of them." *Id*. at 9.

- April 2023: Law enforcement conducted surveillance of 3821 West Fifth Street and observed the residence of the home conducting suspected drug transactions. Id. at 6. Further, law enforcement received multiple 911 calls reporting "drug incidents" in the area of 3821 West Fifth Street—specifically, incidents involving the red van parked outside. *Id*. at 6–7. Officers conducted a traffic stop on the red van and noted the driver as Isiah Green. *Id*. at 9.

- May 2023: Law enforcement conducted an additional trash pull from 3821 West Fifth Street and found further indicia of drug trafficking: "multiple used hypodermic needles, some with residue in them" as well as "multiple clear plastic baggies with the corners

ripped off of them." *Id.* at 10. Law enforcement also found travel documentation for "ISIAC GREENE" and "DEANDRE WESTMORELAND" from Chicago, Illinois to Duluth, Minnesota. *Id.*

- <u>June 2023</u>: The confidential reliable informant confirmed that the Cash DTO was "still actively selling heroin and or fentanyl in the Duluth area," and law enforcement continued to receive complaints from concerned citizens "about possible drug activity from the red Chrysler van." *Id.*

Those factual averments demonstrate the persistent narcotics trafficking activity of the Cash DTO and establish law enforcement's basis for believing that the Cash DTO was using 3821 West Fifth Street and the red minivan to conduct its drug sales. The renter information connected the home to Ezell Lucas, and the travel documentation for, among others, Mr. Westmoreland from Chicago to Duluth confirmed the informant's information regarding the DTO's Chicago-based runners circulating through the home. Contrary to Mr. Westmoreland's claim, the suspected trafficking was not "intermittent" or "isolated"—the informant stated that the DTO "always" had someone "in Duluth delivering the drugs," as confirmed by the litany of concerned citizen complaints about suspected drug activity from 3821 West Fifth Street and the red minivan throughout the months preceding the search. And the tip from the informant in June, coupled with the recent citizen complaints, established that the trafficking activity continued through the date of the warrant.

Considered against the prevailing legal authority on the "relaxed temporal requirements of non-staleness" for narcotics conspiracies, *Ortiz*, 143 F.3d at 733, Mr. Westmoreland's arguments about the supposed absence of a "temporal nexus" are without merit. ECF No. 219 (Westmoreland Post-Hearing Br.) at 1.

Second, Mr. Westmoreland's assertion that the averments regarding the "evidence found during the trash pulls" was "vague and lacked specificity" is incorrect. *Id.* at 6. The affidavit explains precisely what officers found in the trash at 3821 West Fifth Street: (a) "several plastic baggies with the corners cut off, a white powdery residue, and two small pieces of tin foil in the bags"; (b) "multiple clear sandwich baggies with the corners ripped out of them"; (c) "hypodermic needles, some with residue in them" and "multiple clear plastic baggies with the corners ripped off of them"; (d) "a bag of 'medical cannabis' with the number 3.5 on it"; and (e) "a Greyhound bus ticket with the name of 'ISIAC GREENE' on it, which was a one-way ticket from Chicago, IL, to Duluth, MN" as well as "a United Airlines plane ticket from Chicago, IL, to Duluth, MN with the name on the ticket being a 'DEANDRE WESTMORELAND.'" Gov't Exh. 6 June 2023 3821 W 5th St & Chrysler SW) at 9–10. By any measure, that information is highly specific. Further, the affidavit explained the relevance of the plastic baggies with the corners cut off: "People dealing the narcotics will place the controlled substances in the corner

44

of the bags, twist the corner around until it breaks off from the bag, and tie a knot to close the ripped off corner of the bag up." *Id.* at 9. That articulation is not vague or ambiguous—it is a clear explanation of why the specific evidence identified is indicative of drug trafficking.

Recognizing the "substantial deference" afforded "a magistrate's determination of probable cause," *United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008), Mr. Westmoreland has not provided a basis for suppressing the evidence obtained pursuant to the June 7, 2023, warrants. The factual averments establishing probable cause were neither "stale" nor "vague." Rather, the averments detail with a considerable specificity the ongoing drug trafficking activity of the Cash DTO from the locations identified for search.

The R&R should be adopted and Mr. Westmoreland's motion denied.

## 2. The warrant to search Mr. Chism's and Mr. Westmoreland's cellphones is likewise supported by probable cause and appropriately tailored to the relevant timeframe.

Following the search, law enforcement applied for and obtained a warrant to conduct an "in-depth forensic examination" of the cellphones found on Mr. Westmoreland and Mr. Chism during their arrests. Gov't Exh. 9 (June 2023 Chism & Westmoreland Phone SW). Mr. Chism sought to suppress the evidence obtained pursuant to that warrant, arguing, among other things, that the warrant application "never establishes an adequate nexus between the alleged criminal activity and Mr. Chism himself." Doc. 180 (Chism Mot. to

Suppress) at 5–6.  Magistrate Judge disagreed, explaining that the affidavit "provides enough of a background to demonstrate probable cause that the red Chrysler van was indeed being used to traffic drugs in Duluth," and, as Mr. Chism was found inside the red van with the phone in his possession, there was likewise probable cause "to believe that evidence of activity relating to the 'Cash' drug trafficking organization would be found on Defendant Chism's phone."  ECF No. 235 (R&R) at 60–61.  Further, Magistrate Judge Brisbois explained that even regardless of the probable cause determination, "the evidence seized pursuant to the execution of the warrant would nevertheless be admissible under the *Leon* good faith exception."  *Id.* at 61.

Now, Mr. Chism objects to the R&R, arguing that Magistrate Judge Brisbois erred in concluding that the warrant affidavit established the requisite probable cause to justify the search.  ECF No. 238 (Chism Obj. to R&R) at 4–7.  Mr. Chism is mistaken.

First, the warrant affidavit establishes the "adequate nexus" between the alleged criminal activity and Mr. Chism.  The affidavit details the extensive investigative efforts that uncovered the Cash DTO's use of the West 5th Street home and the red Chrysler minivan to conduct its distribution activities.  *See* Gov't Exh. 9 (June 2023 Chism & Westmoreland Phone SW) at 3–9.  Specifically, the affidavit describes tips from confidential informants about the Cash DTO's distribution activities, various "trouble neighbor" calls

and 911 reports that both the stash pad and red minivan were being used to sell drugs, and trash pulls from the stash pad that revealed evidence of narcotics and further connection to known members of the Cash DTO. *Id*. Then, the affidavit then goes on to explain the fruits of the house and minivan search, noting how the search "resulted in the seizure of approximately 391 grams of fentanyl, 262 grams of a methamphetamine/fentanyl mixture, $9,930 in cash (proceeds from narcotics sales), firearm ammunition, and other evidence of substantial drug sales." *Id*. at 9. The affidavit notes that the two suspects "present at the scene" were identified as Mr. Westmoreland and Mr. Chism. *Id*. Relevant here, the affidavit explains that "[d]uring the arrest of Chism, who was located in the red van, an Apple iPhone, cell phone was found in his possession." *Id*. at 10.

Assessing those averments, Magistrate Judge Brisbois appropriately found that "the evidence contained in the four-corners of the affidavit that the red Chrysler van in particular—which Defendant Chism was driving—contained evidence of controlled substance distribution, and this demonstrated probable cause to believe Defendant Chism's cell phone would lead to further evidence of criminal activity." ECF No. 235 (R&R) at 60. Mr. Chism's protestations to the contrary are without merit. As is Mr. Chism's claim that Magistrate Judge Brisbois improperly "relied heavily on evidence outside the four corners of the warrant." ECF No. 238 (Chism's Obj. to R&R) at 5.

Magistrate Judge Brisbois carefully delineated the information contained in extrinsic sources—including, a police report describing the seizures incident to Mr. Chism's arrest, *see* Gov't Exh. 8 (Sept. 21, 2023, Duluth PD Case Report Detail)—and that found in the warrant affidavit, and for purposes of his analysis, relied only on those averments in the affidavit. *See* ECF No. 235 (R&R) at 59–61. The analysis was factually grounded and legally sound. It should be adopted.

Second, Magistrate Judge Brisbois correctly concluded that regardless of the probable cause determination, the fruits of the cell phone search warrant execution would be admissible under the *Leon* good faith doctrine. Mr. Chism asserts that the warrant application was "so facially deficient that the officers could not have presumed it to be valid" because it "claims merely that [Mr. Chism] was in the vicinity of an area being investigated for drug activity and driving a vehicle that had been used for DTO activities in the past." ECF No. 238 (Chism's Obj. to R&R) at 9. Not so. As Magistrate Judge Brisbois explained, "[g]iven the quantity of information provided in the affidavit regarding the investigation up until June 7, 2023, as well as the substantial quantities of controlled substances and drug trafficking indicia found during the June 7, 2023, search, combined with Defendant Chism's presence at the scene as the sole occupant of a vehicle used by the drug distribution organization, the resulting warrant is by no means 'so facially deficient' or 'so

lacking in indicial of probable cause' as to render the officer's reliance on the warrant's validity 'entirely unreasonable.'"  ECF No. 235 (R&R) at 61.

Because the warrant affidavit contains the requisite probable cause showing, Mr. Chism's motion to suppress should be denied.

## C.    Mr. Green's Objections (ECF No. 237)

The final motions were filed by Defendant Anthony Green.  The first is a motion to suppress evidence obtained incident to his arrest on October 23, 2025.  *See* ECF No. 165 (Green First Mot. to Suppress).  The second is a motion to dismiss.  *See* ECF No. 167 (Green Mot. to Dismiss).  Magistrate Judge Brisbois rejected both as contrary to the facts at issue.  *See* ECF No. 235 (R&R) at 63–65, 69–72.  The R&R should be adopted and the motions dismissed.

### 1.    When law enforcement arrested Mr. Green on October 25, 2023, they had reason to believe that Mr. Green had committed or was committing a crime.

In his pretrial motions, Mr. Green sought to suppress the fentanyl officers seized when arresting Mr. Green on October 23, 2023.  *See* ECF No. 226 (Green Post-Hearing Br.) at 6–8.  Specifically, Mr. Green argued that officers "lacked the requisite probable cause to believe that he had committed any crime within a reasonable time before the rest."  *Id.* at 6.  Magistrate Judge Brisbois disagreed.  After reviewing the government's evidentiary submissions and hearing testimony from the arresting officer, Magistrate Judge Brisbois concluded that "based on the totality of the circumstances surrounding the

arrest of Defendant Green," there was "sufficient probable cause to believe Defendant Green had committed a criminal offense which permitted his arrest and search incident thereto." ECF No. 235 (R&R) at 65. That recommended ruling should be adopted.

It is well established that a warrantless arrest "is reasonable under the Fourth Amendment where it is supported by probable cause." *Galarnyk v. Fraser*, 687 F.3d 1070, 1074 (8th Cir. 2012) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). And probable cause exists "when the facts and circumstances within an officer's knowledge are sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime." *Id.* (citing *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)).

As the record shows, the events of October 25, 2023, were part of law enforcement's lengthy, ongoing investigation into the Cash DTO's Duluth-based distribution activities. Law enforcement conducted an extensive undercover operation that involved in 12 controlled buys—four involving Mr. Green. *See* ECF No. 235 (R&R) at 64. After seizing a substantial quantity of fentanyl and methamphetamine from Mr. Green's cousin and co-conspirator, Isaiah Green, when investigating Isaiah Green's overdose death, law enforcement identified Defendant Anthony Green "form video footage of Green hiding items in a wooded area." *Id.* Officers searched the wooded area where Mr. Green "was observed at," and found and seized "90 individually packaged

bags of fentanyl that weighed approximately 50 grams in total"—that is, the Cash DTO's remaining fentanyl stash in Duluth. *Id.*

The two seizures and final undercover buy involving Mr. Green occurred on October 12, October 18, and October 20, respectively—five to 13 days prior to Mr. Green's arrest on October 25. Accordingly, on the date of Mr. Green's arrest, law enforcement had identified Mr. Green as the Cash DTO's most current runner in Duluth. Further, the day of the search, officers monitoring the location of Defendant Ezell "Cash" Lucas's cellphone learned that Mr. Lucas, the head of the Cash DTO, was en route to Duluth. *See* ECF No. 235 (R&R) at 35–36. Given the sizable fentanyl seizure on October 20 and the subsequent decline in outgoing calls to drug customers, law enforcement suspected Mr. Lucas was bringing more controlled substances to Duluth from Chicago to distribute. Then, as Sgt. Wilson explained during the October 2024 evidentiary hearing, officers watched as Mr. Lucas drove to Mr. Green's house; the two men got into Mr. Green's car for a brief exchange before parting. *See* ECF No. 220 (Oct. 16, 2024, Hearing Tr.) at 99–101.

Those facts, taken together, "are sufficient to lead a person of reasonable caution to believe" that Mr. Green "ha[d] committed or [was] committing a crime" when they determined to apprehend him on October 25, 2023. *Galarnyk v. Fraser*, 687 F.3d 1070, 1074 (8th Cir. 2012). Accordingly, law enforcement had probable cause to arrest Mr. Green that day. *See id.*

In response, Mr. Green again attempts to parse out the individual incidents and assess each in isolation. That is improper. As the Eighth Circuit noted in *Galarnyk*, the probable cause assessment requires analyzing the totality of "the facts and circumstances within an officer's knowledge." *Id.* The totality of the evidence known to Sgt. Wilson and his colleagues on October 25, 2023, reasonably led them to believe that on that day, Mr. Lucas met with Mr. Green—then, the Cash DTO's most current runner in Duluth—to resupply fentanyl following the sizable fentanyl seizure on October 20, 2023. And, indeed, when officers apprehended Mr. Green, he had a considerable amount of fentanyl packaged for sale in his sweatshirt pocket. See ECF No. 220 (Oct. 16, 2024, Hearing Tr.) at 102–03.

Further, Mr. Green's efforts to undermine the evidence supporting that conclusion are belied by the facts. For the fentanyl seizure from the woods, Mr. Green attempts to dismiss the evidence against him as "unsubstantiated assertion." ECF No. 237 (Green Obj. to R&R) at 9. That is incorrect. Sgt. Wilson testified that law enforcement obtained still images of video recordings capturing Mr. Green going into the woods at the precise entry point from where the fentanyl was seized both before and after the seizure. See ECF No. 220 (Oct. 16, 2024, Hearing Tr.) at 95–96. Moreover, that location is the same place where Mr. Green sold fentanyl to the undercover agent just two days prior to the seizure. *Id.*; *see also* ECF No. 235 (R&R) at 64.

For the fentanyl sales to the undercover officer, Mr. Green asserts that those sales should be disregarded because the record "does not support a conclusion that Mr. Green was being arrested for those incidents which occurred substantially before October 25." ECF No. 237 (Green Obj. to R&R) at 9. The final undercover purchase from Mr. Green occurred on October 18— hardly "substantially before October 25." *Id.* Regardless, on this, Mr. Green misses the point. Those sales demonstrate Mr. Green's role as a local distributor for the Cash DTO and, when assessed with the October 20 seizure and phone traffic and in-person meeting between Mr. Green and Mr. Lucas on the day of the arrest, establish that on the day of the arrest, Mr. Green was the Cash DTO's current operator in Duluth. That evidence, taken together, informed law enforcement's assessment that Mr. Lucas met with Mr. Green that day to resupply him with fentanyl.

Finally, Mr. Green argues that the decision to arrest him on October 25, 2023, was "based on association with an alleged drug trafficker rather than on substantive evidence that Mr. Green was in possession of or transacting drugs." ECF No. 237 (Green Obj. to R&R) at 8. Again, Mr. Green is incorrect. Mr. Green was not arrested for his "association" with an "alleged drug trafficker"; he was arrested because law enforcement had confirmed Mr. Green's role as a fentanyl distributor for the Cash DTO and reasonably

concluded that he had met with the head of the DTO that day to procure additional fentanyl for sale.

For those reasons, Mr. Green's argument that officers lacked probable cause to arrest him on October 25 is without merit. Magistrate Judge Brisbois's R&R should therefore be adopted and Mr. Green's motion to suppress denied.

### 2. Mr. Green's motion to dismiss and related motion for the disclosure of grand jury records are contradicted by the evidence and should be denied.

Finally, Mr. Green objects to Magistrate Judge Brisbois's recommendation that this Court deny Mr. Green's motion to dismiss and related motion to order the disclosure of the grand jury transcript. *See* ECF No. 237 (Green Obj. to R&R) at 11–20. Specifically, Mr. Green asserts that the government lacks evidence to support the drug quantities attributed to Mr. Green in the Indictment. But that is belied by the evidence as detailed above and as articulated by Magistrate Judge Brisbois. The evidence of Mr. Green's knowing and voluntary participation in the conspiracy alleged (as previously disclosed to Mr. Green's counsel) is overwhelming. The duration and extent of Mr. Green's involvement establishes that the full scope of the Cash DTO's operation was "reasonably foreseeable" to him. As such, the Indictment appropriately charges Mr. Green with conspiracy to distribute fentanyl and methamphetamine, in violation of 18 U.S.C. §§ 841(b)(1)(A) and 846.

It is well established that "a defendant in a conspiracy may be held responsible for all reasonably foreseeable drug quantities that were in the scope of the criminal activity that he jointly undertook." *United States v. Littrell*, 439 F.3d 875, 881 (8th Cir. 2006). Accordingly, in assessing the conspiracy drug quantity "reasonably foreseeable" to a particular defendant, the factfinder is not limited to the amount "actually seized from [that defendant]." *United States v. Jones*, 559 F.3d 831, 835 (8th Cir. 2009). Rather, the Eighth Circuit instructs that it is wholly appropriate to draw reasonable inferences from the direct and circumstantial evidence presented, including evidence of seizures involving co-conspirators during the conspiracy period, *see Littrell*, 439 F.3d at 880–81, phone communications involving the defendant and other members of the conspiracy regarding drug sales, *United States v. Foxx*, 544 F.3d 943, 951 (8th Cir. 2008) (finding that defendant's participation in "telephone conversations" with co-conspirator, which "indicated" that he "knew [his co-conspirator] engaged in marijuana transactions with numerous individuals and that he was generating a substantial amount of income," "could enable a reasonable jury to conclude [the defendant] could have reasonably foreseen the extent of the conspiracy"), witness testimony about drug sales during the conspiracy period, *see United States v. Mallett*, 751 F.3d 907, 916 (8th Cir. 2014) (crediting, for purposes of calculating drug weight, witness who testified to seeing "each of the[] three [defendants] possessing

approximately fourteen grams of crack cocaine on multiple occasions: Allen more than ten times, Mallett about ten times, and Tyler about five times"); *Jones*, 559 F.3d at 835 (crediting co-conspirator testimony about estimated drug acquisition and sales from June to November 2006), and evidence "regarding large amounts of cash" that the defendant and his co-conspirators possessed in connection with the distribution activities. *Littrell*, 439 F.3d at 881.

The evidence in this case (which was disclosed to Mr. Green in two batches—the first, on March 1, 2024; the second, on June 5, 2024) demonstrates that Mr. Green was personally involved in the Cash DTO by no later than June 2023, if not much earlier. Defendant Ezell Lucas's phone data includes a text thread between Mr. Lucas and Mr. Green that begins on June 3, 2023 (*n.b.*, there is also a Facebook Messenger conversation between the two men that begins January 10, 2023). *See* Gov't Exh. 24 (Feb. 6, 2024, Cash DTO Phone Analysis) at 14. And in June 2023, confidential informants identified Mr. Green in Duluth, selling fentanyl for the Cash DTO from the DTO's West 5th Street stash house the week after law enforcement searched the stash house and seized 391.8 grams of fentanyl packaged for sale and 262 grams of meth. Gov't Exh. 11 (June 2023 3821 West 5th Street & Saturn Ion SW) at 10. Law enforcement confirmed Mr. Green's identity through physical surveillance and a subsequent search. *Id.*

In the months that followed, law enforcement seized an additional 184.33 grams of fentanyl and 574.29 grams methamphetamine from the Cash DTO. Law enforcement accomplished this through 17 separate seizure events: 12 separate undercover buys, two searches incident to a traffic stop, as well as a search pursuant to a warrant, a seizure of abandoned property, and a seizure incident to an overdose death investigation. As demonstrated in the disclosures provided to Mr. Green, he was personally involved in six of those seizure events.

Moreover, the evidence demonstrates that the fentanyl and methamphetamine that law enforcement seized represents but a fraction of the Cash DTO's drug distribution activities from this period. As detailed in the warrant affidavits from June 23, August 16, and October 30, confidential reliable informants personally observed Mr. Green and other members of the Cash DTO servicing drug customers throughout the summer and fall of 2023. *See* Gov't Exh. 11 (June 2023 3821 West 5th Street & Saturn Ion SW) at 10–12; Gov't Exh. 16 (Aug. 2023 Willard Munger Inn Unit 103 SW) at 4–5; Gov't Exh. 23 (Oct. 2023 Cash DTO Phone SW) at 13–19. The informant tips were corroborated by law enforcement surveillance, undercover buys, and the data from Mr. Lucas's phone showing Mr. Lucas coordinating drug sales with Mr. Green and the other co-conspirators operating in Duluth. *Id*.; *see also* Gov't Exh. 24 (Feb. 6, 2024, Cash DTO Phone Analysis) at 3–35. The coordination

57

was consistent across co-conspirators throughout the time period captured—from February through October 2023. *See* Gov't Exh. 24 (Feb. 6, 2024, Cash DTO Phone Analysis) at 3–35. The coordination was further consistent with the substantial drug proceeds that Mr. Green and the other co-conspirators reported to Mr. Lucas—thousands of dollars for each "jab" (again, the larger bag containing the smaller, user-quantity bindles that the Cash DTO typically used). *Id*. at 15 ("1 –1890$ i didn't get to finish that jab it was still 6 left"); 16 ("1080"); 25 ("Cruz gave me 3158"), ("This how much it should be put up when you done (along with a screenshot of a phone calculator with the number 9,568)"); 27 ("So that 8,350 from you big 30"). The substantial proceeds are confirmed through the photos that the Duluth-based distributors sent to Mr. Lucas, including this picture from Mr. Green on July 11, 2023:



Against that factual backdrop, Magistrate Judge Brisbois concluded there was "ample evidence" supporting "the underlying Indictment in this case as it pertains to Defendant Green." ECF No. 235 (R&R) at 71–72. The evidence and Magistrate Judge Brisbois's findings notwithstanding, Mr. Green—through his counsel—repeats the allegation that the government's undersigned counsel "must have misrepresented the evidence and/or presented the grand jury with an indictment that it knew could not be supported." ECF No. 237 (Green Obj. to R&R) at 11.

That accusation is both outrageous and patently false. As is Mr. Green's bizarre insistence that the government's undersigned counsel "acknowledged" to Mr. Green's attorney that the government "did not have evidence to support the amounts of drugs alleged against Mr. Green in the Indictment, but hoped to develop evidence through further investigation." *Id*. at 6. The government, through its undersigned attorney, categorically denied those allegations in its initial response to Mr. Green's motion. *See* ECF No. 192 (Gov't Resp.) at 56–57. The government now affirms that categorical denial.

The accusations leveled are also nonsensical. Mr. Green has had all the evidence in this case since June of last year. Government counsel repeatedly outlined that evidence to Mr. Green's attorney over several phone calls. The government then detailed that evidence—with supporting exhibits attached—in its responses to the defendants' motions. And based on that evidence,

Magistrate Judge Brisbois concluded that the Indictment as to Mr. Green was supported by probable cause.

Despite the government's decision to seek an indictment in this case, a federal grand jury's decision to issue that indictment, the government's vigorous defense of that indictment, and a court finding that the evidence presented amply supports the allegations in that indictment, Mr. Green and his attorney contend yet again that the government's undersigned counsel confessed on a phone call that the evidence in the case was insufficient. That simply doesn't make sense. It is belied by logic, the evidence in this case, and the case history since indictment.

Moreover, Mr. Green and his attorney persist in arguments they know to be untrue. In his sworn declaration dated September 20, 2024, Mr. Green's attorney made the following representation:

> The prosecution made additional disclosure on June 5, 2024. The discover[y] contained some information about examination of cell phones. I could not find any evidence from the cell phone examination that support further involvement in drugs by Mr. Green. I also did not observe any allegations suggesting involvement by Mr. Green in drug distribution beyond the incidents described above.

ECF No. 168 (J. Kushner Decl.) ¶ 12.

In his objections to the R&R, Mr. Green asserts that the government failed to present "substantive evidence" that would "support a conclusion" that the Cash DTO engaged in the "hundreds of additional sales" necessary to show

60

"there was more than 400 grams."  ECF No. 237 (Green. Obj. to R&R) at 15.
And Mr. Green claims there is "no evidence that [he] discussed the extent of
the conspiracy with co-defendants or otherwise knew the extent of the
conspiracy." *Id*. at 17.

Those assertions are flatly contradicted by phone analysis report for the
Cash DTO phone.  *See* Gov't Exh. 24 (Feb. 6, 2024, Cash DTO Phone Analysis).
As discussed above, the report details text communications between the head
of the Cash DTO, Mr. Lucas, and the DTO's distributors in Duluth—including
Mr. Green.  *Id*.  In the exchanges, Mr. Green and his fellow distributors
routinely reported thousands of dollars in drug sales.  For example, on July 3,
2023, Mr. Green texted Mr. Lucas that he would "count the money and/or drugs
and report the inventory back" (i.e., "finna hit the room n shit send u the
count").  *Id*. at 15.  Two hours later, Mr. Green gave the update:  "i got 1450
and 11 left on the one i'm on now" (i.e., $1,450 in sales, with 11 bindles
remaining).  *Id*.  Three days after that, Mr. Green reported that he sold an
additional $1,080 of fentanyl and texted Mr. Lucas a photograph of the money
in a plastic bag.  *Id*. at 16.  And then 11 days after that, Mr. Green sent Mr.
Lucas a text message showing thousands of dollars in cash alongside a larger
bag (or "jab") containing a substantial quantity of fentanyl packaged for sale.
*Id*. at 20.

It is inconceivable that Mr. Green's counsel, after reviewing that report, could genuinely believe that the report contains no evidence "suggesting involvement by Mr. Green in drug distribution" beyond the four instances in which he sold fentanyl to the undercover agent.   ECF No. 168 (J. Kushner Decl.) ¶ 12.  It is likewise inconceivable, upon reviewing that report in full, that Mr. Green and his counsel could genuinely believe that the government lacked any evidence showing that Mr. Green "discussed the extent of the conspiracy with co-defendants" or that the Cash DTO as a whole made the requisite "hundreds of additional sales" beyond the 12 controlled buys conducted through the undercover operation.   ECF No. 237 (Green. Obj. to R&R) at 15, 17.  Put simply, those arguments are not true.  They are flatly contradicted by the evidence.

As Magistrate Judge Brisbois concluded, the evidence substantiates the allegations in the Indictment as to Mr. Green, and Mr. Green's assertions to the contrary are without merit.  Mr. Green's motion to dismiss should therefore be denied.  As should Mr. Green's related motion to disclose the grand jury transcript.

## **CONCLUSION**

The evidence of the defendants' knowing and voluntary participation in the criminal conspiracy charged is overwhelming.  And the investigation that uncovered that evidence was thorough and expansive—untainted by any

constitutional concerns warranting suppression.  Accordingly, the defendants'

motions should be denied.

Dated: February 11, 2025                  Respectfully Submitted,


                                          LISA D. KIRKPATRICK
                                          Acting United States Attorney


                                          *s/ Garrett S. Fields*
                                          BY:  GARRETT S. FIELDS
                                          Assistant U.S. Attorney