UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

          Plaintiff,

v.

Carl Maurice Brown, Robert Desean Chism, Matthew James Erickson, Anthony Lenard Green, Ezell Cordero Lucas, Deandre Michael Westmoreland, and Pharoo Nasun Witherspoon,

          Defendants.

File No. 24-cr-26 (ECT/LIB)

**OPINION AND ORDER**

---

Garrett S. Fields, Department of Justice – United States Attorney's Office, District of Minnesota, Minneapolis, MN, for Plaintiff United States of America.

Brian N. Toder, Chestnut Cambronne PA, Minneapolis, MN, for Defendant Carl Maurice Brown.

Jean M. Brandl, Office of the Federal Defender – MN, Minneapolis, MN, for Defendant Robert Desean Chism.

Thomas C. Plunkett, Attorney at Law, St. Paul, MN, for Defendant Matthew James Erickson.

Jordan S. Kushner, Law Office of Jordan S. Kushner, Minneapolis, MN, for Defendant Anthony Lenard Green.

Steven E. Wolter, Kelley, Wolter & Scott, P.A., Minnetonka, MN, for Defendant Ezell Cordero Lucas.

Jill A. Brisbois, The JAB Firm, Minneapolis, MN, for Defendant Deandre Michael Westmoreland.

James M. Ventura, Attorney at Law, Wayzata, MN, for Defendant Pharoo Nasun Witherspoon.

---

The United States has charged Defendants Carl Maurice Brown, Robert Desean Chism, Matthew James Erickson, Anthony Lenard Green, Ezell Cordero Lucas, Deandre Michael Westmoreland, and Pharoo Nasun Witherspoon with conspiracy to distribute fentanyl and methamphetamine. ECF No. 1 at 1–2. The defendants filed numerous motions for dismissal, suppression, and discovery, all of which Magistrate Judge Leo I. Brisbois addressed in a Report and Recommendation. *See* ECF No. 235. All defendants but Mr. Brown object to portions of the Report and Recommendation. *See* ECF Nos. 236, 238, 240, 241, 242, 243. Mr. Green and Mr. Erickson also appeal Judge Brisbois's order denying disclosure of grand jury materials and a task force policy manual, respectively. ECF Nos. 237, 239; *see* ECF No. 234. This order presumes familiarity with the Report and Recommendation.

## I

The defendants object to the denial of their suppression motions, and one defendant objects to the denial of his motion to dismiss the indictment. Because the defendants have objected, I am required to review the Report and Recommendation de novo pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 72.2(a)(3) and 72.2(b)(3).

## A

The defendants object to the Report and Recommendation to the extent it recommends denying their motions to suppress. *See* ECF No. 240 (Mr. Lucas's objection); ECF No. 236 (Mr. Witherspoon's objection); ECF No. 243 (Mr. Erickson's objection); ECF No. 241 (Mr. Westmoreland's objection); ECF No. 238 (Mr. Chism's objection); ECF No. 242 (Mr. Green's objection).

2

1

Mr. Lucas moved to suppress evidence obtained during a February 24, 2022, search of his motel room on the grounds that the warrant was invalid. ECF No. 135 (original motion); ECF No. 205 (amended motion).[1] He also argued that warrants to track his cell phone (August 1, 2023, and September 28, 2023) and to search his phone (October 30, 2023) improperly relied on evidence from the unlawful search. ECF No. 205 at 1–2. He also requested a *Franks* hearing. ECF No. 225 at 16–22. Judge Brisbois recommended denying these motions, and denied the request for a *Franks* hearing. Report and Recommendation at 44, 46, 46 n.24, 74–75. Mr. Lucas objected, arguing that the good-faith exception to the exclusionary rule did not apply, that the phone warrants were tainted, and that he is entitled to a *Franks* hearing. ECF No. 240 at 5–9.

A brief background is helpful. Starting in December 2021, law enforcement received information from a confidential informant that a person who went by "Cash" was selling fentanyl in Duluth. ECF No. 220 at 19–20. That informant provided Cash's phone number, which a second informant corroborated in February 2022. *Id.* at 20. The informants identified a second individual who worked with Cash; he went by "Shorty." *Id.* A third informant corroborated the information about Cash. *Id.* at 20–21. Acting on those statements, law enforcement used the phone number to conduct a controlled buy from Cash on February 17, 2022. *Id.* at 21–22. After the controlled purchase, law enforcement

---

[1]    The amended motion adds a suppression motion related to the October 30 search. *Compare* ECF No. 205 at 1, *with* ECF No. 135 at 1.

applied for and received a warrant for a pen register trap and trace on the phone; that warrant allowed officers to identify calls or texts that contacted the phone, as well as the phone's location. *Id.* at 22. On February 23, geolocation data showed the phone moving from Chicago to Duluth, and the next day officers tracked it to a white Chevrolet Blazer parked at a Motel 6. *Id.*; Gov't Ex. 1 at 7–8. Officers observed two men matching the second informant's descriptions of Cash and Shorty exiting the Blazer at the Motel 6. Gov't Ex. 1 at 7. The officers asked motel staff who the Blazer belonged to; motel staff identified Mr. Witherspoon and provided the officers with a guest list that showed him staying in Room 227. *Id.* at 8.

Deputy Matthew Nevanen of the St. Louis County Sheriff's Office obtained a warrant to search and seize controlled substances from Mr. Witherspoon on February 24. Gov't Ex. 1 at 13; ECF No. 220 at 29. The search warrant application requested authorization to search "the premises at the Motel 6, 200 North 27th Avenue West, Room #227, the motor vehicle of a white Chevrolet Blazer, unknown year, displaying Wisconsin temporary license plate C5557HE and the person of Pharoo N Witherspoon Jr," listing his date of birth. Gov't Ex. 1 at 3.

But the search warrant application also contained a significant error. Its opening paragraph requested permission to search the following "premises," "person(s)," and "motor vehicle(s)":

**Pharoo Nasun Witherspoon Jr, Date of Birth [redacted]**
**White Chevrolet Blazer, unknown year, displaying**
**Wisconsin temporary license plate C5557HE.**
**Pharoo Nasun Witherspoon Jr, Date of Birth [redacted]**

Gov't Ex. 1 at 2 (bolding original). Mr. Witherspoon's name was mistakenly listed twice, and no premises were listed at all. At other points the application included the motel address and room number—it appeared in the middle of the application and its final paragraph. *Id.* at 3, 9. Deputy Nevanen testified that he drafted the application and had made a clerical error; he should have included the motel address and room number in the opening paragraph. ECF No. 220 at 29–30.

The resulting search warrant reproduced the clerical error. On its first page, it said that Deputy Nevanen submitted an application "for a warrant to search the following described premises, person(s), and motor vehicle(s)," and then listed Mr. Witherspoon's name twice and his car, without listing the "premises" at all. *Id.* at 11. The motel's address or room number did not appear anywhere on the warrant. *Id.* at 11–13. The warrant authorized Deputy Nevanen and other officers "to enter and search . . . the above-described premises, person(s), and motor vehicle(s)," but never specified Room 227 of the Motel 6. *Id.* at 13.

Officers nonetheless carried out the search that night. ECF No. 220 at 30. They arrived at the Motel 6 and saw the white Chevrolet Blazer about to leave the parking lot. *Id.* Inside were Cash and Shorty, whom they later identified as Mr. Lucas and Mr. Witherspoon, respectively. *Id.* at 30, 44. The officers stopped them and took them to the Duluth Police Department Headquarters to be searched and interviewed. *Id.* at 31. Other

officers stayed on the scene and began to search Room 227. *Id.* at 31–32. Deputy Nevanen "assisted with the initial entry into Room 227," but didn't search it and returned to Headquarters to search and interview Mr. Witherspoon. *Id.* at 31.

Back at Headquarters, Deputy Nevanen began to interview Mr. Witherspoon and provided him with a copy of the warrant. *Id.* at 32. As he handed it over, Deputy Nevanen noticed that Mr. Witherspoon's name was listed twice and the motel address and room number were omitted. *Id.* He called an officer at Room 227, explained the error, and told him to stop the search. *Id.* at 32–33, 64. He also said that he would apply for a revised warrant. *Id.* at 33. But the Room 227 search had already concluded, and officers had discovered fentanyl in, among other places, a red gym bag containing Mr. Lucas's I.D. card. *Id.* at 34. Deputy Nevanen decided not to apply for a revised warrant. *Id.* at 33, 65.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It requires that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984).

To deter Fourth Amendment violations, the Court has adopted the exclusionary rule, which "forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). Whether a Fourth Amendment violation occurred and whether

the rule applies are separate questions. *See United States v. Leon*, 468 U.S. 897, 906 (1984). Because the exclusionary rule "interfere[s] with the criminal justice system's truth-finding functions" and allows some guilty defendants to "go free," *id.* at 907, its application has been limited to situations where its deterrent effect outweighs its social costs. *See Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."); *Davis v. United States*, 564 U.S. 229, 237 (2011) ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."). One exception, from *Leon*, is when an officer "reli[ed] on the magistrate's probable-cause determination and on the technical sufficiency of the warrant," and the officer's reliance was objectively reasonable. *Leon*, 468 U.S. at 922. *Leon* and its progeny counsel that

> [w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

*Davis*, 564 U.S. at 238 (cleaned up). As the Court put it in *Herring*, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." 555 U.S. at 144.

"[D]epending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to

be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. For example, the search warrant in *Groh v. Ramirez*, 540 U.S. 551 (2004), purported to identify the items to be searched and seized, but instead it identified the premises.[2] *Groh*, 540 U.S. at 554. It read, "there is now concealed [on the specified premises] a certain person or property, namely [a] single dwelling residence two story in height which is blue in color and has two additions attached to the east. The front entrance to the residence faces in a southerly direction." *Id.* at 554 n.2 (alterations in original). The failure to describe the items to be seized with particularity rendered the warrant "plainly invalid," which would have been obvious from "a cursory reading" or even "a simple glance." *Id.* at 557, 564. The warrant "did not describe the items to be seized *at all*," and that absence could not "be characterized as a mere technical mistake or typographical error." *Id.* at 558. And the fact that the application described the items to be seized "d[id] not save the *warrant* from its facial invalidity," since the "high function" of a warrant "is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection." *Id.* at 557.

Warrants that fail the particularity requirement in less obvious ways do not trigger the exclusionary rule. *See United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994) (reasoning that *Leon* had not made "a categorical pronouncement that one cannot rely in

---

[2]    *Groh* is about qualified immunity, not evidence suppression. But it is a relevant authority because "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer." *Groh*, 540 U.S. at 565 n.8 (quoting *Malley v. Briggs*, 475 U.S. 335, 344 (1986)).

good faith on a facially defective warrant"). For example, in *United States v. Szczerba*, a warrant commanded the search of "said person" instead of "said property"—a hotel room and a vehicle that were described "meticulous[ly]" earlier in the warrant. 897 F.3d 929, 936–37 (8th Cir. 2018). The reference to person rather than property was nonsensical and apparently a clerical error. *Id.* But because the warrant described the hotel room and the vehicle, "a reasonable officer executing the warrant likely would have read the warrant to authorize the search of the particularly described property and not the person who was mentioned only in relation to the property." *Id.* at 937. Though the officer drafted the warrant negligently, she "was most mindful of the Fourth Amendment warrant requirement, in that she asked for consent to search, secured the hotel room after consent was refused, applied for a warrant, and concealed no facts from the judge." *Id.* at 939 (quotations removed). Therefore the warrant was not facially deficient, and the evidence obtained from the search was not suppressed. *Id.* at 938.

Similarly, the good-faith exception applied in *Sheppard*, where officers executed what they reasonably believed was a valid warrant. 468 U.S. at 988. There the officer was unable to find a standard warrant form, so he used a form specifically tailored for "controlled substance" seizures—even though he planned to search for evidence of a murder, which the affidavit explained. *Id.* at 985. The officer told the judge that he couldn't find a more appropriate form, and the officer showed which portions to delete to make the search warrant valid. *Id.* at 986. The judge, however, forgot to delete the reference to "controlled substance," and officers seized materials within the scope of the affidavit, but outside the scope of the erroneous warrant. *Id.* at 986–87. The officer's

conduct "was objectively reasonable and largely error-free," and the crucial mistake was the judge's clerical error, so the good-faith exception applied. *Id.* at 990.

Here, Judge Brisbois found that though the warrant failed to particularly describe the place to be searched, Deputy Nevanen acted in good faith, so excluding the evidence "would not result in appreciable deterrence of police misconduct," and the exclusionary rule did not apply. Report & Recommendation at 44. Deputy Nevanen composed a detailed application that listed the motel address and the room number, he believed the warrant authorized the search, and he tried to halt the search as soon as he learned of the defective warrant. *Id.* at 43–44. Judge Brisbois found that this conduct fell outside the deliberate, reckless, or grossly negligent behavior the exclusionary rule aims to deter, so it did not trigger exclusion. *Id.* at 44.

Mr. Lucas objects, arguing that the warrant is "so deficient that no police officer could reasonably presume it was valid." ECF No. 240 at 6. As in *Groh*, a reasonable police officer would recognize its "glaring deficiency" at a "simple glance." *Id.* at 7. There is precedent on this exact issue: In Mr. Lucas's state-court proceedings, Judge Dale O. Harris found that *Groh* required suppressing the evidence from the Room 227 search, and the State of Minnesota did not appeal. *Id.*; *see* ECF No. 240-1 (state-court opinion). Mr. Lucas distinguishes this case from *Szczerba*, where the warrant referenced a person where it should have described a place; there, the warrant was deemed facially valid, and the officer brought the warrant and supporting affidavit with her for the search. Here, neither of those things happened, and "neither Investigator Nevanen nor any of the searchers ever glanced at the warrant before searching Room 227 and seizing its contents." ECF No. 240

at 8.  Mr. Lucas concludes that all the material seized pursuant to the deficient warrant—including those seized pursuant to subsequent warrants that relied on the evidence from the February 24 search—should be excluded.  *Id.*

I find this case to be more like *Groh* than *Szczerba* or *Sheppard*.  The *Groh* warrant lacked the items to be seized, and this warrant lacked the place to be searched.  The Fourth Amendment requires both to be described with particularity.  Here, the hotel address and room number were entirely absent from the search warrant.  A reasonable officer reading the warrant would have had no idea that she was authorized to search Room 227, and she would not even have known to go to the Motel 6 in Duluth.  The warrant's failure to describe the premises with particularity—or at all—was apparent from a quick glance.

The warrants in *Szczerba* and *Sheppard* are distinguishable.  In *Szczerba*, the erroneous reference to "said person" instead of "said property" did not render the warrant facially invalid.  The property was described in detail elsewhere on the warrant—not just on the affidavit—and a reasonable officer could have believed that the warrant was valid despite the nonsensical reference to "said person."  The warrant here had a far more obvious deficiency, and the only mention of the address and room number occurred on the application.[3]  The mistake was also more egregious than that in *Sheppard*, where the judge

---

[3]      There is an exception to the particularity requirement for warrants that incorporate the application, but it doesn't apply here.  *See United States v. Curry*, 911 F.2d 72, 77 (8th Cir. 1990) ("[A] description in the supporting affidavit can supply the requisite particularity if 'a) the affidavit accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein.'" (quoting *United States v. Strand*, 761 F.2d 449, 453 (8th Cir. 1985))).  The Report and Recommendation correctly concluded that the application was not incorporated by reference, and it did not accompany the warrant.  Report & Recommendation at 42–43.

forgot to remove "controlled substance" from the items to be searched after the officer identified the problem, and the officer relied on the judge's assurance that the warrant was valid. Here, Deputy Nevanen and not the judge made the original error, and the mistake was the absence of a place to be searched, not a mis-categorization of items to be seized.

The Government argues that the error was "clerical" or "typographical" and so "does not warrant suppression." ECF No. 245 at 36. It contends this case is distinguishable from *Groh*, where the Court noted that the failure to describe the items to be seized could not be "fairly . . . characterized as a mere technical mistake or typographical error." *Groh*, 540 U.S. at 558. The Government argues that because Deputy Nevanen made a typographical error in drafting, *Groh* is inapplicable. ECF No. 245 at 36.

This argument is unconvincing. Crediting Deputy Nevanen's testimony that he made a "typo," the drafting error that the warrant adopted was more significant than "a mere technical mistake." *Groh*, 540 F.3d at 558. As explained above, *Groh*'s mistake was a failure to identify *any* items to be seized, and the mistake here was a failure to identify *any* place to be searched. That's unlike the erroneous single word in *Szczerba*, or the clerical error made by the judge in *Sheppard*.

The Government also argues that suppression isn't justified because the police work was not deliberate, reckless, or grossly negligent, as required under Eighth Circuit exclusionary-rule precedent. ECF No. 245 at 33–34. Again, this is unconvincing. It is true that Deputy Nevanen demonstrated prudence in several respects: He included the room number and address in several places on the warrant application, and he attempted to call off the search as soon as he spotted the mistake. But in other ways the police work was

grossly negligent.  An obvious error in the search warrant application was missed, and its adoption in the warrant was not noticed, despite the fact that the mistake was on the front page and printed in bold text.  Apparently none of the other officers caught the mistake. That is strong evidence that they did not examine the warrant.  The combined failures amount to gross negligence, which is one kind of wrongful conduct the exclusionary rule aims to deter.

Because the February 24 search relied on a facially deficient warrant that no reasonable officer could have presumed to be valid, the good-faith exception does not apply, and all evidence seized from Room 227 will be excluded.  The Report and Recommendation will be overruled in that regard, and Mr. Lucas's motions [ECF Nos. 135, 205] and Mr. Witherspoon's motion [ECF No. 136] will be granted to that extent.

Mr. Lucas further argues that the searches of his cell phone are tainted by the unconstitutional search of Room 227, and that evidence should be suppressed as well.  ECF No. 240 at 1.  To the extent he argues this, his motions will be denied because that evidence was acquired through an independent source, as Judge Brisbois correctly analyzed.

After the Motel 6 search in February 2022, law enforcement applied for and received two warrants to track Mr. Lucas's cell phone (August 1, 2023, and September 28, 2023) and one warrant to search its contents (October 30, 2023).  ECF No. 225-1; ECF No. 225-2; Gov't Ex. 23.  All three applications included this paragraph:

> On February 24, 2022, [law enforcement] executed a search warrant at the Motel 6 in Duluth.  Ezell Lucas and Pharoo Nasun Witherspoon . . . were arrested, and police located; approximately 12.9 grams of suspected fentanyl packaged for sale, approximately 23.2 grams of a suspected heroin/fentanyl

mix also packaged for sale, plus an addition approximate 4.4 grams of 11.3 grams of suspected fentanyl between both parties.  A total of $1,863.00 was also seized as evidence of drug sales.  Both Lucas and Witherspoon have been formally charged in Saint Louis County District Court for Aiding and Abetting 1st Degree Sale of Heroin and Aiding and Abetting 2nd Degree Sale of Heroin, the disposition is still pending.

ECF No. 225-1 at 4; ECF No. 225-2 at 4–5; Gov't Ex. 23 at 3.

The warrant applications also contained extensive additional information about the drug trafficking organization, starting a year after the challenged search.  For example, on February 21, 2023, a confidential informant told officers that Mr. Lucas possessed large amounts of fentanyl for sale.  ECF No. 225-1 at 5; ECF No. 225-2 at 5; Gov't Ex. 23 at 4.  On March 28, a tipster identified a house on West Fifth Street as a center of possible drug activity.  ECF No. 225-1 at 5; ECF No. 225-2 at 5–6; Gov't Ex. 23 at 4.  The email address listed on the house's public utilities account had the "street name," "Dub Justus," and a Facebook search for that phrase resulted in two profiles using that name; one of the profile pictures was of Mr. Lucas.  ECF No. 225-1 at 6; ECF No. 225-2 at 6; Gov't Ex. 23 at 5.  The warrant applications total thirty-five paragraphs, ECF No. 225-1, fifty-nine paragraphs, ECF No. 225-2, and seventy-seven paragraphs, Gov't Ex. 23.  Of these, only one paragraph in each relies on the evidence from Room 227.  According to all three warrants, officers learned Mr. Lucas's phone number[4] through a confidential informant in

---

[4]    The warrant applications noted that members of the drug trafficking organization changed phone numbers regularly.  The number listed in the 2023 warrants was apparently not Mr. Lucas's during the 2022 search.  ECF No. 225-1 at 7; ECF No. 225-2 at 8; Gov't Ex. 23 at 7.  It would be a different matter if the warrants' only information about Mr. Lucas's phone came from the Motel 6 search on February 24, 2022, since that evidence

June 2023, not from the February 24 search.  ECF No. 225-1 at 7; ECF No. 225-2 at 8; Gov't Ex. 23 at 7.

The exclusionary rule applies not only to evidence illegally obtained but also to the "fruit of the poisonous tree"—that is, incriminating evidence derived from the initial constitutional violation.  *Nardone v. United States*, 308 U.S. 338, 341 (1939).  This rule is subject to the exception that evidence legally obtained from an independent source should not be excluded.  *See Wong Sun v. United States*, 371 U.S. 471, 487 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).  "[T]he more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"  *Nix v. Williams*, 467 U.S. 431, 442 (1984) (quoting *Wong Sun*, 371 U.S. at 488).  As the Eighth Circuit has put it:

> A warrant obtained after an illegal search is not an independent source if either of the following are true: "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry," and "if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." In other words, *Murray* asks the following two questions, both of which must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them.

must be excluded.  But Mr. Lucas does not argue this point, and the record does not support it.

*United States v. Swope*, 542 F.3d 609, 613–14 (8th Cir. 2008) (citation omitted) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)).

As Judge Brisbois noted, the phone warrants were supported by ample independent evidence beyond that obtained from Room 227. Report & Recommendation at 45–46. There was evidence connecting Mr. Lucas to the drug trafficking organization from confidential informants. He was connected to the West Fifth Street house through public records and social media pages. The phone number to be tracked and searched was identified by a confidential informant over a year after officers unconstitutionally seized evidence from Motel 6. The Room 227 search did play a minor role in generating probable cause, but under the first prong of *Swope*, officers would have applied for the warrant had they not searched Room 227. They had sufficient reason to believe Mr. Lucas was engaged in drug dealing, and without the contraband seized on February 24, 2022, the warrants still supported probable cause. Therefore, the independent source doctrine applies, and the evidence obtained pursuant to the 2023 phone warrants will not be excluded. Mr. Lucas's motions [ECF Nos. 135, 205] will be denied to the extent he requests suppression of that evidence.

Lastly, Mr. Lucas argues he is entitled to a *Franks* hearing to consider Investigator Taylor Stutsman's statements in her search warrant applications on August 1, September 28, and October 30. *See* ECF No. 225 at 16–22; ECF No. 240 at 9. Denial of a *Franks* hearing is a non-dispositive ruling, so it is reviewed for clear error. *See United States v. Hari*, No. 18-cr-150(1) (DWF/HB), 2019 WL 7041849, at *1 (D. Minn. Dec. 20, 2019); D. Minn. LR 72.2(a)(3)(A).

"Under *Franks* and its progeny, a defendant may challenge a search warrant on the grounds that the probable cause determination relied on an affidavit containing false statements or omissions made knowingly and intentionally or with reckless disregard for the truth." *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008); *see Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). "To obtain a *Franks* hearing a defendant must make a substantial preliminary showing that there was an intentional or reckless false statement or omission which was necessary to the finding of probable cause, a requirement which is 'not easily met.'" *Snyder*, 511 F.3d at 816 (quoting *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002)). In other words, a defendant must meet two elements: the officer made a knowing or reckless false statement or omission, and that statement was necessary to establish probable cause.

Mr. Lucas claims that the statements above knowingly or recklessly omitted the fact that on August 1, 2023, Judge Harris ruled that the materials from February 24 search were unconstitutionally seized and granted Mr. Lucas's motion to suppress in his state-court proceedings. ECF No. 240 at 9; *see* ECF No. 240-1 at 14. Investigator Stutsman applied for two of the warrants after knowing that the evidence was suppressed.[5] *See* ECF No. 225-2 at 15, 19 (showing application for and issuance of warrant on September 28, 2023); Gov't Ex. 23 at 22, 24 (showing application for and issuance of warrant on October 30,

---

[5]  Investigator Stutsman applied for and was issued the August 23 warrant just half an hour before Judge Harris's opinion came down. *See* ECF No. 240-1 at 1 (showing opinion released at 2:09 p.m.); ECF No. 225-1 at 14 (issuing warrant at 1:27 p.m.).

2023).  The State of Minnesota did not appeal Judge Harris's suppression ruling.  ECF No. 220 at 70.

The Government does not contest that these warrant applications described evidence without mentioning it had been suppressed.  And it does not challenge that Investigator Stutsman knew of Judge Harris's order, and that it was not appealed.  *See id.* at 71 (noting that "everyone on the task force was aware of it").  Mr. Lucas has established a reckless omission.

But the second element is not met; Mr. Lucas has not shown that Investigator Stutsman's omissions were necessary to finding probable cause.  The Government's argument that there would be probable cause absent evidence from the February 24 search is persuasive.  *See* ECF No. 245 at 38–40.  As explained above, all three warrant applications include substantial information about the drug trafficking organization, starting a year after the challenged search.  Mr. Lucas has not met his burden of a "substantial preliminary showing" that Investigator Stutsman's omission was necessary for probable cause in any of the three warrant applications.  He is therefore not entitled to a *Franks* hearing on the matter.  It was not clear error for Judge Brisbois to deny him one, and that ruling will be affirmed.

2

Mr. Witherspoon moved to suppress evidence from the February 24 search on several grounds, including that the search was pursuant to an invalid warrant, and that officers unconstitutionally collected his personal data from the Motel 6 guest registry.  *See* ECF No. 136.  Judge Brisbois recommended denying this motion.  Report &

18

Recommendation at 41, 74.  Mr. Witherspoon objects, arguing that Judge Brisbois misapplied binding precedent.  ECF No. 236 at 2–7.

This motion will be granted.  Mr. Witherspoon was subject to the same February 24 search as Mr. Lucas and moved to suppress evidence from that search for the warrant's failure to describe the premises with particularity.  ECF No. 136 at 4–5.  As explained above, the search of Room 227 was unconstitutional.  His motion to suppress evidence from that search [ECF No. 136] will be granted and the Report and Recommendation will be overruled in that respect.

Mr. Witherspoon's objection raised a different argument,[6] however, and this argument is not convincing.  When police questioned staff at the Motel 6, staff provided the officers with a guest registry containing Mr. Witherspoon's name, told them he had booked Room 227 from February 20 to February 25, and said that the white Chevrolet Blazer belonged to him.  Gov't Ex. 1 at 8.  This constitutes a Fourth Amendment violation, Mr. Witherspoon argues.  While his motion will be granted regardless, it is worth explaining that he hasn't shown a privacy interest in the motel guest list, and that the issue was correctly analyzed in the Report and Recommendation.

"To establish a violation of rights under the Fourth Amendment, a person must have a 'constitutionally protected reasonable expectation of privacy' in the area searched or the

---

[6]    Mr. Witherspoon didn't object to the Report and Recommendation's conclusion that the search warrant was valid.  It doesn't matter—he made the motion, and for the reasons Mr. Lucas identified, that motion should be granted.  *See* 28 U.S.C. § 636(b)(1) ("A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.").

items seized." *United States v. Sesay*, 937 F.3d 1146, 1151 (8th Cir. 2019) (quoting *United States v. McIntyre*, 646 F.3d 1107, 1111 (8th Cir. 2011)).  The Supreme Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979); *see United States v. Miller*, 425 U.S. 435, 443 (1976).  The Eighth Circuit, applying *Smith v. Maryland*, has held that a motel guest "had no legitimate expectation of privacy in the identification card that he provided when registering at the motel."  *Sesay*, 937 F.3d at 1152.

Mr. Witherspoon argues that the officers' actions run contrary to *City of Los Angeles v. Patel*, 576 U.S. 409 (2015).  *Patel* held that a city ordinance "that requires hotel operators to make their registries available to the police on demand is facially unconstitutional because it penalizes them for declining to turn over their records without affording them any opportunity for precompliance review."  *Id.* at 412.  Since the State of Minnesota and the City of Duluth had a similar statute and ordinance,[7] respectively, he argues that *Patel* forbids the collection of his data.  ECF No. 236 at 5.

This argument misreads *Patel*.  The disputed privacy interest in *Patel* belonged to the hotels, not to the guests.  *See Patel*, 576 U.S. at 414.  There the Court recognized that

---

[7]    Mr. Witherspoon asserts that *State v. Leonard*, 943 N.W.2d 149 (Minn. 2020), invalidated Minnesota's statute requiring hotels to keep guest registers and make them "accessible on demand" to police.  *See* ECF No. 236 at 5; Minn. Stat. § 327.10.  That's incorrect.  The court upheld the statute, reasoning that it did "not authoriz[e] an unconstitutional level of police suspicion."  *Leonard*, 943 N.W.2d at 161.  Mr. Witherspoon also argues that a Duluth City Ordinance requiring hotels to keep guest registers (and silent about giving police access to them) is unconstitutional.  ECF No. 236 at 5.  He cites no supporting case law.

"hotel operators remain free to consent to searches of their registries and police can compel them to turn them over if they have a proper administrative warrant." *Id.* at 423; *see Sesay*, 937 F.3d at 1152. And Minnesota's statutory scheme is irrelevant to the Fourth Amendment analysis here.[8]

Under *Sesay*, Mr. Witherspoon had no federal privacy interest in the personal information he voluntarily gave Motel 6. The police obtained his name, room number, and car information without intruding on his reasonable expectation of privacy. There was no Fourth Amendment violation.

The last objection is that he didn't give the information voluntarily, so the third-party doctrine doesn't apply. ECF No. 236 at 5. Under Minnesota law, "[e]very person . . . applying for guest accommodations [at a hotel] shall furnish to the operator . . . the registration information necessary," including name, home address, and (if traveling by motor vehicle), vehicle registration and license plate numbers. Minn. Stat. § 327.11 (incorporating Minn. Stat. § 327.10). Violating this provision is a misdemeanor. Mr. Witherspoon argues that he had a "constitutional right to travel to Minnesota and to lodging at the Motel 6 in Duluth, free from the government's invasion of his confidential personal data." ECF No. 236 at 6. Since his right to travel was violated by the statute, he did not voluntarily provide personal information to Motel 6, and the police could not obtain it without a warrant—so he argues.

---

[8]    *Leonard* recognized a state constitutional privacy interest in personal information shared with a hotel. *Leonard*, 943 N.W.2d at 158. But that has no impact on whether Mr. Witherspoon's federal constitutional rights were violated here.

This argument also fails.  Mr. Witherspoon cites no cases showing that the right to interstate travel includes the right not to provide hotels personal identifying information, and that proposition contradicts case law.  "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses 'any classification which serves to penalize the exercise of that right.'"  *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (citations omitted) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 340 (1972)); *cf. United States v. Hare*, 308 F. Supp. 2d 955, 1001 (D. Neb. 2004) ("The constitutional right to travel through Nebraska is not a right to travel in any manner one wants, free of state regulation, and it does not give defendants the right to ignore Nebraska's traffic laws at their discretion.").  Mr. Witherspoon has not shown that Minnesota's guest registry statute or Duluth's corresponding ordinance actually deters travel, primarily aims to impede travel, or penalizes the exercise of the right through classification.  So the statute and ordinance do not violate his right to travel and do not render his personal information involuntarily given.  There is no reason to think that the third-party doctrine is inapplicable here.

The Report and Recommendation correctly determined that Mr. Witherspoon had no legitimate expectation of privacy in the Motel 6 guest registry.  *See* Report & Recommendation at 41.  Therefore Mr. Witherspoon's motion to suppress evidence from the February 24 search [ECF No. 136] will not be granted on these grounds, though it will be granted on other grounds, as explained above.

3

Mr. Erickson moved to suppress evidence obtained pursuant to a search warrant on April 11, 2023, on the grounds that the search warrant application lacked specificity, relied on stale information, and failed to establish a nexus between criminal conduct alleged and the location where the items were supposed to be found. *See* ECF No. 126. Judge Brisbois recommended denying this motion. Report & Recommendation at 51–52, 74. Mr. Erickson objects, reasserting his stale information argument, as well as contending that one informant is unreliable, that Judge Brisbois relied on evidence outside the four corners of the search warrant and made other errors, and that the good faith exception to the exclusionary rule does not apply.[9] ECF No. 243 at 3–13.

"[P]robable cause must exist at the time of the search and not merely at some earlier time." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005). "There is not fixed formula for determining when information has become stale." *United States v. Smith*, 266 F.3d 902, 904 (8th Cir. 2001). Courts should look to "the circumstances of the case, including the nature of the crime under investigation and the property sought in the search." *Kennedy*, 427 F.3d at 1141. "In investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant [do] not necessarily make the information stale . . . ." *United States v. Ortiz-Cervantes*, 868

---

[9]     The Government's Omnibus Response does not address Mr. Erickson's Motion to Suppress or his Motion for Disclosure of Task Force Policy Manual. *See* ECF No. 245; *see* ECF Nos. 126, 182 (Mr. Erickson's motions). But the Government "respectfully asks this Court to adopt the R&R and deny the defendants' motions," which I take to include Mr. Erickson's two motions. ECF No. 245 at 1. *See generally* D. Minn. LR 72.2(b)(2) (noting that a party "may respond" to objections, but is not required to do so).

F.3d 695, 700 (8th Cir. 2017) (alteration in original) (quoting *United States v. Jeanetta*, 533 F.3d 651, 655 (8th Cir. 2008)).

Mr. Erickson argues that the search warrant application relies on too much old information, but this argument is unpersuasive. *See* ECF No. 243 at 7. While the application does provide evidence that Mr. Erickson sold or possessed drugs in 2019 and August 2022, *see* Gov't Ex. 4 at 4–5, it also includes more recent evidence. One informant told investigators on September 21, 2022, that Mr. Erickson was involved in drug dealing, *see id.* at 5, and on October 11, 2022, said Mr. Erickson was continuing to sell fentanyl, *see id.* at 6. A second informant stated on November 5, 2022, that Mr. Erickson was selling heroin. *Id.* at 6. On January 13, 2023, a third informant said Mr. Erickson was "selling the 'best' fentanyl in the area." *Id.* at 7. The third informant told investigators on March 2 that Mr. Erickson was still selling fentanyl and making deliveries in a silver Jeep. *Id.* at 8. On March 29 the third informant said Mr. Erickson continued to sell heroin and fentanyl. *Id.* On April 6, law enforcement observed Mr. Erickson park a "grey colored SUV"—a woman entered the vehicle, exited after a short time, and Mr. Erickson drove off.[10] *Id.* And on April 10, law enforcement observed Mr. Erickson "made short-term stops at residences in a 2005 Jeep Liberty," consistent with a drug deal. *Id.* Sometime between April 10 and 13, investigators conducted a controlled buy of fentanyl from Mr. Erickson. *Id.* at 9 (stating on April 13 that the controlled buy happened "[i]n the past 72 hours"). In

---

[10] It is not clear from the search warrant application whether the officers believed that the grey SUV and the silver Jeep were the same vehicle or not. Mr. Erickson highlights the discrepancy, *see* ECF No. 243 at 10, but does not argue that it makes the search warrant invalid.

short, the application describes a pattern of behavior over several months, from late 2022 to April 2023, up to three days before the application was submitted and approved, indicating Mr. Erickson's involvement in dealing drugs. Given the secretive and long-running nature of the offense, the information justifying the search warrant was not stale. The solitary mention of evidence from 2019 does not render the rest of the information stale. "[C]onsidering the totality of the circumstances, the information supported a belief [Mr. Erickson] was engaged in an ongoing criminal enterprise and evidence of his illegal activities would be found at his residence." *Jeanetta*, 533 F.3d at 655 (concluding that a two-week period between controlled buy and warrant issuance did not make the information stale).

Mr. Erickson's next argument is likewise unpersuasive. He says that the search warrant application relied on an unreliable information from an individual referred to as Confidential Reliable Informant #3, or "CRI#3." ECF No. 243 at 8–9. The application "does not provide any of the background and confirmations needed for a [confidential informant] to be considered reliable." *Id.* Mr. Erickson accurately presents the law on reliability: "The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." ECF No. 243 at 9 (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)); *accord United States v. Scherrer*, 640 F. App'x 580, 584 (8th Cir. 2016). *Williams* goes on to explain that "[i]nformation may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by

independent evidence." 10 F.3d at 593. Under those criteria, the challenged information

is reliable. The application states that CRI#3

> has provided reliable information that has been corroborated
> through independent law enforcement investigation to include
> a check of police reports and information from other law
> enforcement agencies, other confidential reliable information
> and your affiant's own personal knowledge. CRI#3 has
> provided information in other narcotics investigations that has
> proven to be accurate and reliable. CRI#3 has provided
> information that led to the arrest of one individual for
> controlled substances and violent crime.

Gov't Ex. 4 at 7. Mr. Erickson next states that CRI#3 is the only informant who told law

enforcement Mr. Erickson was driving a silver Jeep, but it is not clear why this matters.

ECF No. 243 at 9–10; *see* Gov't Ex. 4 at 8. Law enforcement corroborated CRI#3's

statement; they observed Mr. Erickson making short-term stops at residences in a silver

Jeep. Gov't Ex. 4 at 8. There is no reason to think this statement was unreliable, and no

reason that "all information from CRI#3 should be excised from the search warrant

application." ECF No. 243 at 10.

Mr. Erickson also argues that the Report and Recommendation makes several errors,

but none of them undermine Judge Brisbois's factual conclusions or analysis. Take these

arguments in turn.

First, Mr. Erickson says the Report and Recommendation incorrectly states that

CRI#1 told investigators that Mr. Erickson "had adopted the moniker 'EZ.'" Report &

Recommendation at 47. The search warrant only states that CRI#1 said an individual was

known as EZ and identified him as Mr. Erickson. *See* Gov't Ex. 4 at 6. This is quibbling—

there is no legal or practical difference between saying that Mr. Erickson was known as EZ and saying he adopted that moniker.

Second, the Report and Recommendation states that CRI#1's "information was subsequently corroborated by a second confidential reliable informant," CRI#2. Report & Recommendation at 48. But, as Mr. Erickson notes, CRI#2 didn't corroborate all of CRI#1's statements. He corroborated the statements that Mr. Erickson went by "EZ" and sold heroin, but not that he resided in a particular apartment. *See* Gov't Ex. 4 at 6. This does not show that the Report and Recommendation is wrong—it shows the statement about corroboration is vague, but not vague enough to be a substantive error. The application contains enough evidence that nothing hangs on whether CRI#2 identified Mr. Erickson's location.

The Report and Recommendation's third purported error is not a mistake at all. Mr. Erickson says that "[t]he R and R inaccurately relies on information from the October 13, 2023, CRI#3 [meeting] by stating that during this meeting CRI#3 confirmed Mr. Erickson lived at Midtowne Manor in Duluth and that he drives a silver jeep [sic] to deliver controlled substances. This is not accurate as none of this information was relayed until March 2, 2023." ECF No. 243 at 8. This argument is wrong in several ways. Investigators met with CRI#3 twice: on *January* 13—not October—and on March 2, both in 2023. Gov't Ex. 4 at 7–8. It is true that, according to the search warrant, it was during the March 2 meeting that CRI#3 said that Mr. Erickson lived at Midtowne Manor and drove a silver Jeep. *Id.* at 8. But the Report and Recommendation is consistent with that. It says that law enforcement met with CRI#3 "[o]n January 13, 2023, and March 2, 2023," and he

"verified that Defendant Erickson was still selling fentanyl in the Duluth area, lived at Midtowne Manor in Duluth, and informed law enforcement that Defendant Erickson drove a silver Jeep which he used to deliver controlled substances." Report & Recommendation at 48. In other words, the Report and Recommendation relayed CRI#3's statements from two different meetings in one sentence. This is not an error. Even if it were, it is hard to see how a mistake transcribing dates affects the analysis of the search warrant's validity. If CRI#3 told law enforcement incriminating information in March rather than in January, that information is *less* likely to be stale in April.

Fourth, Mr. Erickson argues that the Report and Recommendation analyzes the search warrant's validity by considering evidence outside the four corners of the search warrant application. ECF No. 243 at 3–5. This is incorrect. Judge Brisbois cited pages of the police report from the April 13 search in the "Background" section of the Report and Recommendation. *See* Report and Recommendation at 26 (citing Gov't Ex. 5 at 6, 10–14). That was appropriate. The police report describes evidence seized pursuant to the warrant, including fentanyl—evidence that Mr. Erickson moved to suppress. *See, e.g.*, Gov't Ex. 5 at 13. In the "Analysis" section, Judge Brisbois did not rely on the police report; instead, he considered only material within the four corners of the search warrant application. *See* Report & Recommendation at 47–50. Mr. Erickson's counsel suggests that even though he "cannot identify a tangible prejudice caused by the Magistrate relying on information outside the 4-corners of the application," the inclusion of irrelevant evidence in the Report and Recommendation was improper, and he "respectfully turns to this Court to determine

if a sanction should be imposed."[11]  ECF No. 243 at 4.  It is not clear what counsel is asking; he at least wants to "excise[]" the "offending information" from the present analysis.  *Id.*  Because the Report and Recommendation did not err, I adopt its analysis and statement of the facts.

Because Judge Brisbois was correct that Mr. Erickson's search warrant was valid, it is unnecessary to consider whether the good-faith exception applies.  If it mattered, Mr. Erickson's argument would fail.  He contends that this exception to the exclusionary rule is no longer good law under *Dobbs v. Jackson Women's Health Organization*, because *Leon* is not "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty."  ECF No. 243 at 11 (quoting *Dobbs*, 597 U.S. 215, 231 (2022)); *see Leon*, 468 U.S. at 913 (recognizing good-faith exception).  His counsel acknowledges no "cases or law review articles supporting the claim that *Dobbs* overruled the good faith exception."  ECF No. 243 at 12–13.  Even if this argument were correct, district courts may not decline to follow binding precedent, even if later opinions cast doubt on earlier ones.[12]

---

[11]    I understand "sanction" to entail discipline or penalty.  *See Sanction*, *Black's Law Dictionary* (12th ed. 2024) ("A provision that gives force to a legal imperative by either rewarding obedience or punishing disobedience.").  If that's so, counsel is asking me to consider disciplining or penalizing Judge Brisbois for an error that was non-existent and—on counsel's own account—did not harm Mr. Erickson.  He cites no statute, case, or rule authorizing a district judge to sanction a magistrate judge for committing a harmless error.  I find it hard to believe that's what he requests, so I'll construe the statement as a request not to consider the police report in analyzing whether the search warrant application was justified by probable cause.

[12]    That is not to imply that *Dobbs* casts doubt on *Leon*.  *Dobbs* held that the Due Process Clause of the Fourteenth Amendment protects some substantive rights, but only those that are deeply rooted in American history and implicit in the concept of ordered liberty.  *Dobbs*, 597 U.S. at 231.  The exclusionary rule is not one of those rights.  Instead,

*See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.").  *Leon* remains binding precedent, and I am not at liberty to ignore it where it applies.  The Report and Recommendation correctly concluded that Mr. Erickson was subject to a valid search warrant.  His motion to suppress the evidence obtained during that search [ECF No. 126] will therefore be denied.

4

Mr. Westmoreland moved to suppress evidence obtained pursuant to a search warrant of the West Fifth Street house, executed on June 7, 2023.  ECF No. 154.  Judge Brisbois recommended denying this motion.  Report & Recommendation at 58, 74.  Mr. Westmoreland objects, incorporating the arguments from his pre-hearing memorandum: that the search warrant application was vague, speculative, and stale, and that the good-faith exception did not apply.[13]  ECF No. 241 (incorporating ECF No. 219).

---

it is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348 (1974).  *Leon*'s exception to this rule doesn't purport to be a substantive due process right.

[13]    Usually, when a party objects to the Report and Recommendation, a district court must undertake de novo review pursuant to 28 U.S.C. § 636(b)(1).    Here, Mr. Westmoreland presents no specific objections as required by the Local Rules, instead relying on his previous briefing.  *See* D. Minn. LR 72.2(b)(1) ("A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations . . . .").  There is ample precedent in this District and elsewhere for reviewing such filings for clear error.  *See Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1017 (D. Minn. 2015) (citing *Martinez v. Astrue*, No. 10-cv-5863, 2011 WL 4974445, at *3 (E.D. Pa. Oct. 19, 2011) (collecting cases)).

However, the governing statute does not require "specific" objections, at least not mirroring the language of our Local Rules.  *See* 28 U.S.C. § 636(b)(1) ("Within fourteen

30

Some background facts. Law enforcement obtained a warrant to search and seize materials from the West Fifth Street house and a red Chrysler minivan on June 7, 2023. Gov't Ex. 6 at 12–14. That warrant relied on evidence stretching back to February 24, 2022, up to May 10, 2023. *Id.* at 4–10. It included information from confidential reliable informants, anonymous tipsters, and police observation. *Id.* It also included three "garbage pulls" at the West Fifth Street house—that is, inspections of trash containers outside the residence for signs of criminal activity. *Id.* at 9–10. On February 28, 2023, officers found "several plastic baggies with the corners cut off, a white powdery residue, and two small pieces of tin foil in the bags." *Id.* at 9. On March 7, they discovered "multiple clear sandwich baggies with the corners ripped out of them," with "[o]ne of the bags contain[ing] a small amount of green leafy substance that tested positive for marijuana." *Id.* On May 10, an officer found "multiple used hypodermic needles, some with residue in them, multiple clear baggies with the corners ripped off of them," as well as a plane ticket from Chicago to Duluth bearing Mr. Westmoreland's name. *Id.* at 10. The undersigned officer

---

days after being served with a copy, any party may serve and file *written objections* to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." (emphasis added)). And the Eighth Circuit has "repeatedly emphasized the necessity of *de novo* review," *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994), and has not endorsed "the exception recognized in some circuits that de novo review is not required 'when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations," *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (quoting *Belk*, 15 F.3d at 815). Accordingly, I review Mr. Westmoreland's incorporated objections de novo. *See United States v. Chapman*, No. 18-cr-250 (ECT/SER), 2019 WL 1487847, at *1–2 (D. Minn. Apr. 4, 2019) (discussing the issue at more length).

believed that drug dealers sometimes cut the corners off sandwich bags, and that hypodermic needles were "the primary way to consume narcotics." *Id.* at 9.

On June 7, law enforcement executed the search warrant. Gov't Ex. 8 at 7. Mr. Westmoreland was at the West Fifth Street house. *Id.* When the search uncovered fentanyl and drug paraphernalia, officers arrested Mr. Westmoreland, and he was charged with sale of a controlled substance. *Id.* at 15.

The Fourth Amendment requires search warrants to be justified by probable cause. U.S. Const. amend. IV. "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Murphy*, 69 F.3d 237, 240 (8th Cir. 1995)). "[P]robable cause must exist at the time of the search and not merely at some earlier time." *Kennedy*, 427 F.3d at 1141. "There is not fixed formula for determining when information has become stale." *Smith*, 266 F.3d at 904. Courts should look to "the circumstances of the case, including the nature of the crime under investigation and the property sought in the search." *Kennedy*, 427 F.3d at 1141. "In investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant [do] not necessarily make the information stale . . . ." *Ortiz-Cervantes*, 868 F.3d at 700 (alteration in original) (quoting *Jeanetta*, 533 F.3d at 655).

Further, "a judge may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant," and an officer may also "make reasonable inferences in preparing affidavits in support of a

warrant." *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000) (citations omitted). But there must still be "[s]ufficient information . . . presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

The Report and Recommendation concluded that the evidence in the June 7 search warrant application was not stale and provided probable cause to search the West Fifth Street house and the red Chrysler van. This was correct; under the totality of the circumstances, the span of evidence from February 2022 to May 2023, including informant testimony, anonymous tips, police observation, and garbage pulls, gave rise to a fair probability that criminal activity was occurring at the West Fifth Street house and in the red Chrysler van in June 2023. Evidence of drug dealing arose regularly, not in isolated instances. And given the nature of the offense, it was likely that crimes were ongoing even a month after the last piece of evidence. Officers had reason to believe that a long-running and large drug trafficking organization was using the West Fifth Street house and the red Chrysler van to sell fentanyl and other narcotics. The garbage pulls reinforce this conclusion, with respect to the residence. Mr. Westmoreland's argument that this information was stale is therefore unpersuasive.

Mr. Westmoreland's objection that the garbage pulls provided "vague" and "speculative" evidence likewise fails. It was reasonable for officers and the judge to conclude that the corner-less plastic baggies, white residue, traces of marijuana, and hypodermic needles evidenced drug dealing. A judge must look to the totality of the

33

circumstances, and the incriminating nature of the garbage-pull evidence was made more powerful by the eyewitness testimony of activity consistent with drug dealing. Therefore the Report and Recommendation's conclusion that the June 7 search warrant was backed by probable cause is correct, and Mr. Westmoreland's motion to suppress [ECF No. 154] will be denied.

5

Mr. Chism moved to suppress evidence obtained from his cell phone, which was seized during his arrest on June 7, 2023, and was searched pursuant to a June 23 warrant. ECF No. 180. Judge Brisbois recommended denying this motion. Report & Recommendation at 63, 75. Mr. Chism objects, arguing that the Report and Recommendation looks beyond the four corners of the search warrant application and that, limiting the scope to the four corners, the application fails to connect Mr. Chism with the drug trafficking organization. ECF No. 238 at 4–7. Further, he argues that *Leon*'s good-faith exception does not apply. *Id.* at 7–10.

The following facts build on those relevant to Mr. Westmoreland's motion. Law enforcement obtained a warrant to search and seize materials from the West Fifth Street house and a red Chrysler minivan on June 7, 2023. Gov't Ex. 6 at 12–14. That warrant made no mention of Mr. Chism, though it identified other suspected members of the drug trafficking organization. *See id.* at 5–10. When officers saw the red van arrive at the West Fifth Street house that day, they identified the driver as Mr. Chism, searched the van, and found baggies containing fentanyl. Gov't Ex. 7 at 10–11. Mr. Chism was arrested and

34

taken into custody.  Gov't Ex. 8 at 9.  During the arrest, officers seized his cell phone. Gov't Ex. 9 at 1 [ECF No. 181].

On June 23, law enforcement applied for a warrant to conduct an "in-depth forensic examination" of Mr. Chism's cell phone.  *Id.*  The search warrant application did not include all the facts described above.  It contained information about the wider drug trafficking organization, but only two paragraphs stated facts about Mr. Chism's arrest.  *Id.* at 9–10.  One paragraph simply noted that Mr. Chism was present at the search warrant, charged with sale of a controlled substance, and released pending the ongoing investigation.  *Id.* at 9.  The other reads, "During the arrest of Chism, who was located in the red van, an Apple iPhone, cell phone was found in his possession.  It was taken as evidence during his arrest."  *Id.* at 10 (punctuation original).  It also provided barcode and tag numbers for the phone.  *Id.*  The report mentioned that drugs were seized during the search, but did not specify that any contraband was found in the van.  *Id.* at 9.  On June 23, the officers obtained the warrant to search Mr. Chism's cell phone, and they collected evidence of his involvement in drug sales.  *See* Gov't Ex. 10 (police report).

The Fourth Amendment requires search warrants to be justified by probable cause. U.S. Const. amend. IV.  "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *Solomon*, 432 F.3d at 827 (quoting *Murphy*, 69 F.3d at 240).  "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'"  *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)).

"When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *Solomon*, 432 F.3d at 827 (alteration in original) (quoting *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999)).

The Report and Recommendation determined that, looking only at the four corners of the June 23 search warrant application, "the red Chrysler van—which Defendant Chism was driving—contained evidence of controlled substance distribution, and this demonstrated probable cause to believe Defendant Chism's cell phone would lead to further evidence of criminal activity." Report & Recommendation at 60. It did so "assum[ing], solely for the purposes of its four-corner review of the cell phone search warrant, that no contraband was found in the red Chrysler van since the warrant does not discuss the exact location where the evidence was seized." *Id.* That's because the application provided ample evidence that the van was used to deliver drugs from the West Fifth Street house. *Id.*; *see* Gov't Ex. 9 at 5 (noting that a probation officer saw a man exit the West Fifth Street house and get into the red van, drive to pick up a female passenger, drive around the block, and drop her off at the same area—consistent with a typical drug sale); Gov't Ex. 9 at 6 ("Multiple people in the neighborhood would call in and say there were people dealing drugs out of the red van."); Gov't Ex. 9 at 7 (reporting that neighbor observed the red van park in front of the West Fifth Street house, and occupants from the house got into it); Gov't Ex. 9 at 8 ("Neighbors shared with your affiant additional videos

of the vehicles and the occupants getting out and making hand to hand transactions with the red Chrysler [van], in the area of [the West Fifth Street house].").

Mr. Chism objects, arguing that Judge Brisbois "relied heavily on evidence outside four corners" of the application. ECF No. 238 at 5. This is incorrect. The "Background" section of the Report and Recommendation cites external documents. *See* Report & Recommendation at 26–31 (citing, among other sources, a warrant to search a different vehicle, *see* Gov't Ex. 7, and a police report from the June 7 search, *see* Gov't Ex. 8). But the section analyzing probable cause restricts its view to the June 23 search warrant application. *See* Report & Recommendation at 59–63; Gov't Ex. 9.

Judge Brisbois also correctly concluded that, looking to only the four corners of the search warrant application, there was probable cause to search Mr. Chism's cell phone because of his connection with the red Chrysler van and the evidence seized as a result of the June 7 search. As described above, law enforcement had multiple reports and observations connecting the red van to drug dealing. *See* Gov't Ex. 9 at 5–8. Mr. Chism was inside the van when the search was executed, and had his cell phone with him at the time. *Id.* at 10. The application notes that the June 7 search "on a resident and vehicles" "resulted in the seizure of approximately 391 grams of fentanyl, 262 grams of a methamphetamine/fentanyl mixture, $9.930 in cash (proceeds from narcotics sales), firearm ammunition, and other evidence of substantial drug sales." *Id.* at 9. Mr. Chism was arrested and charged with sale of a controlled substance. *Id.* The totality of the circumstances described by the June 23 search warrant application provided probable cause to search Mr. Chism's cell phone. And since the June 23 warrant was justified by probable

cause, it is not necessary to address *Leon*'s good-faith exception. Mr. Chism's motion to suppress [ECF No. 180] will therefore be denied.

6

Mr. Green moved to suppress evidence incident to his arrest on October 25, 2023. *See* ECF No. 165. Judge Brisbois recommended denying this motion. Report & Recommendation at 65, 74–75. Mr. Green objects, arguing that the officers lacked probable cause to arrest him. ECF No. 242 at 7–11.

Three main facts are relevant. First, undercover officers had purchased drugs from Mr. Green in four controlled buys, three of which occurred on October 2, October 5, and October 18. ECF No. 220 at 119; Gov't Ex. 14 at 1269–97 (Bates Numbers). The final purchase occurred one week before his October 25 arrest. Second, on October 20, a tipster informed law enforcement that someone was hiding something in the woods near the spot of the October 18 controlled buy. ECF No. 220 at 95. The tipster took "photographs and/or video" of the man in the woods, and officers identified him as Mr. Green. *Id.* at 96. That same day, law enforcement searched the area and discovered plastic baggies with fentanyl consistent with those Mr. Green sold in the controlled buys. *Id.* at 95. After the seizure, the tipster told officers that Mr. Green returned to the woods, and he was searching where the drugs had been seized. *Id.* at 96; Gov't Ex. 20 at 5. The tipster also provided images of Mr. Green at the scene post-seizure. ECF No. 220 at 96. Third, Mr. Green met with Mr. Lucas, another alleged member of the conspiracy, on October 25. *Id.* at 98–100. Mr. Lucas drove to Mr. Green's residence, and the two of them sat in the front seats of Mr. Green's car for several minutes. *Id.* 99–100. Police followed Mr. Lucas and Mr. Green

38

after this meeting and arrested them both, Mr. Lucas at a Mexican restaurant and Mr. Green at a gas station. *Id.* at 101.

"The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). It is a higher standard than reasonable suspicion, requiring a "'fair probability' or 'substantial chance' that the person seized has committed an offense." *Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020) (quoting *Gates*, 462 U.S. at 243 n.13). Courts determine whether probable cause exists by looking at the "totality of the circumstances." *United States v. Hager*, 710 F.3d 830, 836 (8th Cir. 2013). "Courts should apply a common sense approach and, considering all relevant circumstances, determine whether probable cause exists." *Id.* (quoting *United States v. Gleich*, 397 F.3d 608, 612 (8th Cir. 2005)).

Mr. Green argues that these facts do not support probable cause. In his view, the controlled buys occurred "substantially before" the October 25 arrest. ECF No. 243 at 9. The woods were near Mr. Green's house, and there is no evidence, he contends, that going to the woods was outside "the course of his daily routine." *Id.* Additionally, Mr. Green's meet-up with Mr. Lucas didn't generate probable cause, since "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." *Id.* at 8 (quoting *Sibron v. New York*, 392 U.S. 40, 62 (1968)). And the fact that he was not charged until four months after the arrest, *see* ECF

39

No. 1 (showing Indictment filed in February 2024), indicates that "[t]he arrest was in reality a pretext to search Mr. Green, his vehicle and other belongings for drugs or evidence of drug activity, and to interrogate him." ECF No. 243 at 9.

The totality of the circumstances supports a finding of probable cause, so Mr. Green's objection will be overruled and the Report and Recommendation will be adopted with respect to the objection. There was substantial evidence that Mr. Green had committed an offense: he had participated in four controlled buys. The most recent instance occurred only one week before the arrest. Similarly, the evidence from the drugs in the woods supports a finding of probable cause—a tipster saw Mr. Green enter the woods, provided images of him doing so, and law enforcement discovered fentanyl in plastic baggies at that spot, which were consistent with those Mr. Green had sold in controlled buys. Lastly, his meet-up with Mr. Lucas also supports probable cause. Mr. Green's reliance on *Sibron* is misplaced, because the defendant there talked to narcotics addicts, not alleged dealers, and there were no other facts supporting probable cause. *See Sibron*, 392 U.S. at 62. Here, officers reasonably believed Mr. Lucas was involved in dealing drugs, so his meeting with Mr. Green in the car provided evidence that Mr. Green had committed a drug-related crime. The totality of the circumstances indicates there was probable cause to arrest Mr. Green on October 25, 2023, so his motion to suppress evidence incident to his arrest [ECF No. 165] will be denied.

B

In addition to moving to suppress, Mr. Green moved to dismiss the Indictment against him pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure. ECF

No. 167.  Judge Brisbois recommended denying this motion.  Report & Recommendation at 72, 75.  Mr. Green objects, arguing that the evidence obtained does not support the charges—specifically, that Mr. Green conspired to distribute 400 grams of fentanyl and 500 grams of methamphetamine.  ECF No. 242 at 11–18; *see* ECF No. 1 at 2 (Indictment).

"[A] defendant in a conspiracy may be 'held responsible for all reasonably foreseeable drug quantities that were in the scope of the criminal activity that he jointly undertook.'"  *United States v. Littrell*, 439 F.3d 875, 881 (8th Cir. 2006) (quoting *United States v. Jimenez-Villasenor*, 270 F.3d 554, 561 (8th Cir. 2001)).  The Government can charge defendants in conspiracies with quantities above the amounts "actually seized." *United States v. Jones*, 559 F.3d 831, 835 (8th Cir. 2009).  In determining a reasonably foreseeable quantity, a factfinder may look to drug quantities possessed by alleged conspirators,  *see United States v. Foxx*, 544 F.3d 943, 951 (8th Cir. 2008), phone calls and messages between co-conspirators about drug sales, *see United States v. Garcia*, 646 F.3d 1061, 1071 (8th Cir. 2011), witness testimony about drug sales, *United States v. Mallett*, 751 F.3d 907, 916 (8th Cir. 2014), and "large amounts of cash," *see Littrell*, 439 F.3d at 881.  But a defendant cannot be liable for a co-conspirator's offenses that were not committed in furtherance of the conspiracy or were outside "the scope of the unlawful project."  *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946).

Mr. Green argues that there is insufficient evidence that he conspired to distribute fentanyl and methamphetamine in the quantities charged.  As he sees it, there is no evidence linking him with the conspiracy until June 2023.  ECF No. 242 at 14 (citing ECF No. 220 at 112).  In that month law enforcement, acting on a tip, obtained a search warrant for the

West Fifth Street house in Duluth, but Mr. Green wasn't there. ECF No. 220 at 112–13; *see* Gov't Ex. 11 (search warrant). A week later, after another tip, the Government obtained another warrant for the same house, and this time it searched Mr. Green but found no drugs on him or in the house. ECF No. 220 at 116–17. The Government's other evidence, Mr. Green argues, also fails to produce drugs in the necessary quantities. Mr. Green was involved in four controlled buys, but these were sales of less than two grams of fentanyl each. *Id.* at 119.[14] What's more, there is no evidence Mr. Green was involved in methamphetamine distribution, he argues. ECF No. 242 at 15–16. The only methamphetamine seized while Mr. Green was linked to the conspiracy was found in a safe in co-conspirator Isiah Green's[15] room after Isiah Green's overdose death, seized on October 12, 2023. Gov't Ex. 17 at 2 (police report). In Mr. Green's view, the Government lacks evidence linking him to the 574.29 grams of methamphetamine found at Isiah Green's house. *See* ECF No. 220 at 123 (testifying that Mr. Green "was never personally connected to any of the drugs or other items that were found" in Isiah Green's house); Gov't Ex. 17 at 3 (stating amount of methamphetamine discovered).

---

[14]    The Government's witness testified that Mr. Green's controlled buys never exceeded one gram of fentanyl. ECF No. 220 at 119. Elsewhere the Government documented the sales as 0.95 grams, 1.94 grams, 1.12 grams, and 0.95 grams. ECF No. 245 at 17. This slight discrepancy doesn't detract from the overall point: Mr. Green's controlled buys consisted of small amounts of fentanyl, relative to the 400 grams in the Indictment.

[15]    To avoid confusion, all references to this individual will use his first and last name, Isiah Green. "Mr. Green" will refer to Defendant Anthony Green. Isiah Green and Mr. Green were cousins. ECF No. 220 at 123–24.

Mr. Green tries to distinguish case law linking a defendant to the "reasonably foreseeable drug quantities" of the criminal activity. *Littrell*, 439 F.3d at 881. These cases all involved significantly more evidence directly linking the defendant with drugs in the quantities charged, he argues. ECF No. 242 at 16–17 (first citing *Littrell*, 439 F.3d at 880–81; then citing *Jones*, 559 F.3d at 835–36; and then citing *Foxx*, 544 F.3d at 951). In *Littrell*, large quantities of methamphetamine were seized from the defendant's residence; in *Jones*, the defendant confessed that he had sold more than the charged amount of cocaine; and in *Foxx*, the defendant's regular phone conversations with a co-defendant indicated the defendant's role in distributing large amounts of marijuana. *See id.*

Mr. Green's attempt to distinguish these cases isn't persuasive. The cases hold that Mr. Green can be "held responsible for all reasonably foreseeable drug quantities that were in the scope of the criminal activity that he jointly undertook." *Littrell*, 439 F.3d at 881; *accord Foxx*, 544 F.3d at 951. Factfinders can still consider evidence of drug quantities that co-conspirators possessed, witness testimony about drug sales, cash in the defendant's possession, and messages about drug deals between co-conspirators, because that evidence sets the scope of the criminal activity. And that evidence exists here, namely co-conspirators' drug possession and messages about drug deals.

Take co-conspirators. There is evidence that Isiah Green was conspiring to distribute methamphetamine. Law enforcement found over 500 grams of the substance in his safe. Gov't Ex. 17 at 3. There is evidence that Isiah Green and Mr. Green were co-conspirators. During the October 18 controlled buy, the undercover officer expressed sympathy for Isiah Green's death and then commented, "I heard you guys lost a lot of

43

slow," using slang for drugs.  ECF No. 220 at 125.  Mr. Green responded, "Mm-hmm," and nodded his head.  *Id.* at 124–25.  That suggests that the methamphetamine Isiah Green possessed was part of the common unlawful project.  *See Pinkerton*, 328 U.S. at 647–48.  There is also evidence of fentanyl sales happening at the West Fifth Street house.  *See* Gov't Ex. 10 (June 6, 2023, police report); Gov't Ex. 11 at 10 (noting that on June 7, 2023, law enforcement seized 391 grams of fentanyl and 262 grams of a methamphetamine /fentanyl mixture from the house).  In June 2023, Mr. Green was seen in a silver Saturn Ion at the West Fifth Street house, *see* ECF No. 220 at 113–14, and there is evidence that the organization used that car for drug deals, *see id.* at 82–83.

And evidence from text messages support a finding that Mr. Green was involved in the conspiracy by that time.  There is a text thread between Mr. Green and Mr. Lucas beginning on June 3, 2023, as well as a Facebook Messenger conversation between the two beginning on January 10, 2023.  Gov't Ex. 24 at 1938 (Bates Numbers).  The messages discuss "jabs"—slang for large drug baggies that hold "bindles," which are small drug baggies.  *Id.* at 1938–40.  There is at least one photo of a substantial amount of cash alongside a jab full of bindles containing a white substance consistent with fentanyl.  *See id.* at 1944.  The text messages also document thousands of dollars in drug sales.  *See id.* at 1939 ("1-1890$ i didn't get to finish that jab it was still 6 left"); *id.* at 1955–56 (including a screenshot with the numbers 1851, 1370, 1810, and 1839, in response to the request, "Send me y'all count in").

Mr. Green contests this evidence.  In a declaration, his attorney stated that in an April 2024 phone call, the prosecutor told him that "the government intended to develop

44

[evidence of Mr. Green's connection to the charged quantities] based on the forthcoming examination of seized cell phones and cooperation from co-defendants."  ECF No. 168 ¶ 11.  The Government provided the cell phone evidence in June 2024, and Mr. Green's attorney "could not find any evidence from the cell phone examination that support further involvement in drugs by Mr. Green."  *Id.* ¶ 12.  He argues that the Government "obtained the Indictment without evidence to support the charges," ECF No. 242 at 19, and that it "must have misrepresented the evidence and/or presented the grand jury with an indictment that it knew could not be supported,"  ECF No. 167 at 2.  The Government denies these allegations.  *See* ECF No. 245 at 59; ECF No. 192 at 56–57.

The attorney declaration does not establish grounds to dismiss the Indictment.  The statement that Mr. Green's attorney couldn't identify evidence in the cell phone records linking Mr. Green with the conspiracy is not persuasive.  The records contain sufficient evidence—discussions of drug paraphernalia, dollar values of sales, and images of drugs and cash—to support the Indictment.  The prosecutor's disputed statement in the phone call is of highly questionable evidentiary value.  Even if the Government did not have the phone records by the April 2024 call, it had evidence of Mr. Green's participation in the conspiracy, and evidence that the organization was distributing drugs in charged quantities.

The Report and Recommendation correctly concluded that there was "ample evidence" of Mr. Green's involvement in the drug trafficking organization that used the West Fifth Street house.  Report & Recommendation at 71.  The drug quantities charged— 400 grams of fentanyl and 500 grams of methamphetamine—were reasonably foreseeable

and within the scope of this conspiracy. Therefore, Mr. Green's motion to dismiss [ECF No. 167] will be denied.

## II

Two defendants appealed other orders in the Report and Recommendation. Mr. Erickson appealed the denial of his motion to disclose the Task Force Policy Manual, and Mr. Green appealed the denial of his motions to disclose grand jury materials. A magistrate judge's rulings on non-dispositive motions are to be reversed only if they are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *accord* D. Minn. LR 72.2(a)(3)(A). This standard of review "is extremely deferential." *Magee v. Trs. of the Hamline Univ.*, 957 F. Supp. 2d 1047, 1062 (D. Minn. 2013); *In re EpiPen Direct Purchaser Litig.*, No. 20-cv-827 (ECT/JFD), 2023 WL 4104000, at *2 (D. Minn. June 21, 2023).

## A

Mr. Erickson moved for disclosure of the Lake Superior Violent Offender Task Force Policy Manual. ECF No. 182. Judge Brisbois denied this motion. Report & Recommendation at 4, 74. Mr. Erickson appeals, arguing that disclosure is required under Federal Rule of Criminal Procedure 16(a)(1)(E)(i). ECF No. 239 at 5–6.

In an April 2023 a search warrant application, law enforcement stated that it conducted an April 8[16] controlled buy, which purportedly "followed the [Policy Manual] for the controlled purchase of controlled substances." Gov't Ex. 4 at 9. On April 11, a

---

[16]    This is an approximate date. The search warrant application, written on April 11, said the controlled buy took place "[i]n the last 72 hours." Gov't Ex. at 9–10.

judge issued the search warrant, and officers searched Mr. Erickson's vehicle and person on April 13. *See* Gov't Ex. 5–9 (police report). Mr. Erickson moved to suppress evidence seized in the April 13 search, *see* ECF No. 126, but he did not allege that the April 8 controlled buy was unconstitutional.

"Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, . . . or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense . . . ." Fed. R. Crim. P. 16(a)(1)(E)(i). "If defendant requests discovery because he thinks the documents sought are material to the preparation of his defense, he must make a prima facie showing of materiality." 2 Charles Alan Wright & Peter J. Henning, *Federal Practice & Procedure: Criminal* § 254 (4th ed. 2009) (footnotes omitted). "Evidence is material under Rule 16 if there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation or assisting impeachment or rebuttal." *United States v. Tornquist*, No. 11-cr-50118, 2012 WL 2862864, at *3 (D.S.D. July 11, 2012) (cleaned up). "A showing of materiality, however, is 'not satisfied by a mere conclusory allegation that the requested information is material to the preparation of the defense.'" *United States v. Krauth*, 769 F.2d 473, 476 (8th Cir. 1985) (quoting *United States v. Conder*, 423 F.2d 904, 910 (6th Cir. 1970)). "Although the materiality standard is not a heavy burden, the Government need disclose Rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor." *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (cleaned up).

The Report and Recommendation denied the motion to disclose the Policy Manual because "there have been no specific allegations that the controlled purchase outline in Defendant Erickson's Motion to Suppress was unconstitutional, nor is there any allegation that the controlled purchases were not properly conducted." Report & Recommendation at 4. Therefore it found the Policy Manual had "no bearing" on Mr. Erickson's defense. *Id.*

Mr. Erickson objects, arguing that the Policy Manual is material to preparing his defense. ECF No. 239 at 5–6. His argument is not that the April 8 controlled buy was unlawful—it is that the Policy Manual helps determine if the April 13 search and seizure violated his constitutional rights. As he puts it, he needs to "determine if the search of his person and vehicle were unconstitutional." ECF No. 239 at 5. Reviewing the Policy Manual "will shed light on the conduct of officers in this specific search and would be used in a future trial to cross examine officers." ECF No. 239 at 6.

This argument does not establish that the Policy Manual is material to preparing Mr. Erickson's defense. He has not made a prima facie case that inspecting the Policy Manual will significantly alter the quantum of proof in his favor or provided a strong indication that it will play an important role in uncovering admissible evidence or assisting impeachment or rebuttal. He has connected the Policy Manual to the April 8 controlled buy, but has not alleged that it affected officers' manner of conducting the April 13 search. There is no obvious inference that the Policy Manual played a role in that event: It was a policy for controlled buys, not searches and seizures. *See* Gov't Ex. 4 at 9. Mr. Erickson

48

has not pointed to anywhere in the police report showing that officers relied on the Policy Manual in conducting the April 13 search.

Since Mr. Erickson has not shown that the Policy Manual is material to preparing his defense, his appeal [ECF No. 239] will be denied.

B

Mr. Green moved for disclosure of grand jury transcripts and grand jury records. *See* ECF Nos. 162, 163. Judge Brisbois denied these motions. Report & Recommendation at 13, 74. Mr. Green appeals, arguing that his motion to dismiss, *see* ECF No. 167, and its supporting declaration, *see* ECF No. 168, indicate "that the government obtained the Indictment without evidence to support the charges," so he has provided grounds for disclosure. ECF No. 237 at 19.

Under Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), "[t]he court may authorize disclosure . . . of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." To make that showing, a defendant must establish a "particularized need" for the records. *Thomas v. United States*, 597 F.2d 656, 657 (8th Cir. 1979); *see United States v. Warren*, 16 F.3d 247, 253 (8th Cir. 1994). Statements that merely express "a generalized hope" that the defendant "might find some defect in the grand jury proceedings" are not "sufficient grounds for disclosure." *Thomas*, 597 F.2d at 658.

As explained in Section I.B, *supra*, Mr. Green has not shown sufficient grounds to dismiss the Indictment, so he has not established a particularized need to access grand jury materials, let alone grounds to dismiss because of a matter that occurred before the grand

49

jury. *See* Fed. R. Crim. P. 6(e)(3)(E)(ii). His appeal [ECF No. 237] will therefore be denied.

## ORDER

Therefore, based upon all of the files, records, and proceedings in the above-captioned matter, **IT IS ORDERED THAT**:

1.     The Report and Recommendation [ECF No. 235] is **ACCEPTED IN PART** and **REJECTED IN PART** as follows:

2.     Defendant Lucas's Objection to the Report and Recommendation [ECF No. 240] is **SUSTAINED** to the extent he moves to suppress evidence from the Room 227 search on February 24, 2022, and otherwise **OVERRULED**.

3.     The remaining Objections to the Report and Recommendation [ECF Nos. 236, 238, 241, 242, 243] are **OVERRULED**.

4.     Defendant Erickson's Motion to Suppress Evidence Obtained by Search Warrant [ECF No. 126] is **DENIED**.

5.     Defendant Lucas's Motion to Suppress Evidence Obtained from Search and Seizure [ECF No. 135] is **GRANTED** to the extent he moves to suppress evidence from the Room 227 search on February 24, 2022, and otherwise **DENIED**.

6.     Defendant Witherspoon's Motion to Suppress Evidence [ECF No. 136] is **GRANTED** to the extent he moves to suppress evidence from the Room 227 search on February 24, 2022, and otherwise **DENIED**.

7.     Defendant Westmoreland's Motion to Suppress Evidence Pursuant to Search Warrant [ECF No. 154] is **DENIED**.

8.      Defendant Green's Motion to Suppress Evidence from Arrest [ECF No. 165] is **DENIED**.

9.      Defendant Green's Motion to Suppress Statement [ECF No. 166] is **DENIED**.

10.     Defendant Green's Motion to Dismiss [ECF No. 167] is **DENIED**.

11.     Defendant Chism's Motion to Suppress Evidence [ECF No. 180] is **DENIED**.

12.     Defendant Lucas's Amended Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 205] is **GRANTED** to the extent he moves to suppress evidence from the Room 227 search on February 24, 2022, and otherwise **DENIED**.

13.     Magistrate Judge Brisbois's denial [ECF No. 234] of Defendant Green's Motion for Disclosure of Grand Jury Transcripts [ECF No. 162] is **AFFIRMED**.

14.     Magistrate Judge Brisbois's denial [ECF No. 234] of Defendant Green's Motion for Disclosure of Grand Jury Records [ECF No. 163] is **AFFIRMED**.

15.     Magistrate Judge Brisbois's denial [ECF No. 234] of Defendant Erickson's Motion for Disclosure of Task Force Policy Manual [ECF No. 182] is **AFFIRMED**.

16.     Magistrate Judge Brisbois's denial [ECF No. 234] of Defendant Lucas and Defendant Witherspoon's request for a *Franks* hearing [ECF No. 225] is **AFFIRMED**.


Dated:  March 13, 2025                    s/Eric C. Tostrud
                                         Eric C. Tostrud
                                         United States District Court

51